UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| NORTHBAY HEALTHCARE GROUP, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> KAISER FOUNDATION HEALTH PLAN, INC., et al., <br><br> Defendants. | Case No. 17-cv-05005-LB <br><br> **ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS** <br><br> Re: ECF No. 29, 39 |

**INTRODUCTION**

Plaintiffs NorthBay Healthcare Group and NorthBay Healthcare Corporation (collectively, "NorthBay") operate two hospitals in Solano County, California. NorthBay brings this action against (1) Kaiser Foundation Health Plan, Inc. ("Kaiser Health Plan"), a health insurance plan; (2) Kaiser Foundation Hospitals, Inc. ("Kaiser Hospitals"), the operator of two other hospitals in Solano County; and (3) the Permanente Medical Group, Inc. ("Permanente"), which manages doctors that work at Kaiser Hospitals' hospitals. The defendants have moved to dismiss NorthBay's complaint.[1]

---

[1] Pursuant to Civil Local Rule 7-1(b), the court finds this matter suitable for determination without oral argument and vacates the hearing set for December 14, 2017.

ORDER – No. 17-cv-05005-LB

NorthBay's primary grievance is that Kaiser Health Plan has been underpaying NorthBay when NorthBay's hospitals treat Kaiser Health Plan enrollees. NorthBay attempts to characterize this dispute as an antitrust conspiracy, bringing a claim under Section 2 of the Sherman Antitrust Act alleging that the defendants have conspired to monopolize the healthcare insurance and services market in Solano County. But NorthBay has failed to allege facts that support its attempt to recast the defendants' interactions with NorthBay specifically into an antitrust conspiracy to monopolize healthcare generally. NorthBay has therefore failed to plead a cognizable claim under Section 2, and the court dismisses this claim.

The rest of NorthBay's claims are state-law claims between non-diverse parties. The court lacks original jurisdiction over those claims and declines to exercise supplemental jurisdiction over them, and therefore dismisses NorthBay's complaint in full. NorthBay may file an amended complaint on or before Thursday, January 11, 2018.

## STATEMENT[2]

### 1. The Defendants

Defendant Kaiser Health Plan is the largest health-care-service plan in the United States.[3] Over 11.8 million people in nine states and the District of Columbia are enrolled in health insurance from Kaiser Health Plan.[4] In Northern California, over 4.1 million people are enrolled in Kaiser Health Plan.[5] Kaiser Health Plan has more than 75% of the commercial-health-insurance market in Solano County.[6]

Defendant Kaiser Hospitals operates hospitals throughout the United States, including two hospitals with emergency departments in Solano County: Kaiser Permanente Vallejo Medical

---

[2] Unless otherwise noted, the fact allegations in the Statement are from the Complaint.

[3] Compl. – ECF No. 1 at 6 (¶ 16). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[4] *Id.*

[5] *Id.*

[6] *Id.* at 26 (¶ 77).

ORDER – No. 17-cv-05005-LB                 2

1 Center in Vallejo and Kaiser Permanente Vacaville Medical Center in Vacaville.[7] Kaiser Hospitals' Vacaville hospital is the county-designated Level II Trauma Center for Solano County.[8]

Defendant Permanente is a medical group comprised of physician-owned, for-profit partnerships and professional corporations.[9] Permanente provides and manages the physicians who service Kaiser Health Plan enrollees at Kaiser Hospitals' hospitals, including Kaiser Hospitals' Vallejo and Vacaville hospitals.[10]

Kaiser Health Plan, Kaiser Hospitals, and Permanente are separate legal entities, and each pursues its own economic interest.[11] They are parties to legal agreements with one another, however, whereby Permanente services Kaiser Health Plan enrollees at Kaiser Hospitals.[12] The three defendants collectively use the registered trademark or trade name "Kaiser Permanente."[13] As Kaiser Hospitals has observed, "Kaiser Permanente is organized in each operating region by three separate but closely cooperating entities: comprised of [Kaiser Hospitals] and [Kaiser Health Plan] . . . and a separate Permanente Medical Group (PMG) in each region in which Kaiser Permanente operates."[14] Kaiser Hospitals has further noted that "separate legal entities are responsible for managing the integrated health care system in California: [Kaiser Health Plan]; [Kaiser Hospitals]; and The Permanente Medical Group, Inc. (TPMG), which contracts with [Kaiser Health Plan] in Northern California."[15]

---

[7] *Id.* at 7 (¶ 17).

[8] *Id.* at 9 (¶ 26); Kaiser Defs. Mot. Ex. 9 (Solano County Health & Social Services Department Policy Memorandum 5900) – ECF No. 34-2 at 2. The court may take judicial notice of matters of public record. *Lee v. City of L.A.*, 250 F.3d 668, 688–89 (9th Cir. 2001).

[9] Compl. – ECF No. 1 at 7 (¶ 18).

[10] *Id.*

[11] *Id.* at 2 (¶ 2), 7–8 (¶ 19), 26 (¶ 78), 30 (¶ 94).

[12] *Id.* at 26 (¶ 79); *see generally id.* at 4 (¶ 7) (alleging "hub-and-spoke" agreements to provide "Health Services").

[13] *Id.* at 7 (¶ 19).

[14] *Id.* at 26 (¶ 78).

[15] *Id.* (internal brackets omitted).

## 2. NorthBay's Allegations

NorthBay operates two hospitals in Solano County; both provide general hospital and emergency services: NorthBay Medical Center in Fairfield and NorthBay VacaValley in Vacaville.[16] NorthBay's Fairfield hospital is the county-designated Level III Trauma Center.[17]

### 2.1 The Cancellation of the Agreement Between NorthBay and Kaiser Health Plan Regarding Payment for Emergency Services that NorthBay's Hospitals Provide to Kaiser Health Plan Enrollees

NorthBay's hospitals provide emergency medical services to patients, including Kaiser Health Plan enrollees.[18] Since 2010, the number of Kaiser Health Plan enrollees treated by NorthBay each year has steadily increased, rising from more than 540 patients in 2010 to over 770 patients in 2016.[19]

In 2010, NorthBay and Kaiser Health Plan entered into an agreement ("Agreement") that set forth the rates that Kaiser Health Plan would pay NorthBay for services NorthBay provided to Kaiser Health Plan enrollees.[20] Under the Agreement, NorthBay agreed to accept a standardized percentage of its "charge master rate" (the standard rate a hospital charges for the services it provides) for Kaiser Health Plan enrollees, instead of its full charge-master rate.[21]

In September 2016, Kaiser Health Plan terminated the Agreement.[22] For a period of time after that, Kaiser Health Plan paid NorthBay at the percentage specified in the Agreement, but after a few months of paying that rate, Kaiser Health Plan began paying NorthBay at less than half of the prior Agreement rate.[23] Kaiser Health Plan also began refusing to pay certain claims submitted by

---

[16] *Id.* at 6 (¶ 12), 9 (¶ 26).

[17] *See id.* at 20 (¶ 61); Kaiser Defs. Mot. Ex. 9 (Solano County Health & Social Services Department Policy Memorandum 5900) – ECF No. 34-2 at 2.

[18] Compl. – ECF No. 1 at 10 (¶ 28).

[19] *Id.*

[20] *Id.* at 15 (¶ 48).

[21] *Id.*; *see id.* at 14 (¶ 44) (defining "charge master").

[22] *Id.* at 17 (¶ 52). NorthBay also alleges that between 2010 and 2016, Kaiser Health Plan beached certain terms of the Agreement, *see id.* at 16–17 (¶¶ 50–51), but it is not bringing a breach of contract claim and is not basing the claims it does bring on those alleged breaches. *See id.* at 33, 35–36 (¶¶ 106, 110, 117, 121) (basing claims only on period after September 2016).

[23] *Id.* at 3 (¶ 5), 17 (¶ 52), 32 (¶ 101).

ORDER – No. 17-cv-05005-LB 4

NorthBay entirely.[24] NorthBay claims that following the termination of the Agreement, Kaiser Health Plan was no longer entitled to pay NorthBay anything less than 100% of NorthBay's charge-master rate for emergency services provided to Kaiser Health Plan enrollees.[25] NorthBay calculates that since the termination of the Agreement, Kaiser Health Plan has underpaid it more than $21.7 million for services it provided to Kaiser Health Plan enrollees.[26] NorthBay claims that Kaiser Health Plan's termination of the Agreement is contrary to its own self-interest and therefore cannot be explained but for an anticompetitive goal.[27]

### 2.2 Allegations That the Defendants "Steer" Kaiser Health Plan Enrollees to or Away From Kaiser Hospitals' Hospitals

NorthBay also claims that the defendants "steer" patients enrolled in Kaiser Health Plan insurance to or away from Kaiser Hospitals' hospital emergency rooms based not on the health condition of these patients but on the defendants' financial incentives.[28] In support of this claim, NorthBay alleges that makes the following factual allegations:

First, NorthBay alleges that "Kaiser" demands that NorthBay contact Kaiser's "Emergency Prospective Review Program" ("EPRP"), which is staffed by Permanente physicians, each time a Kaiser Health Plan enrollee appears at a NorthBay hospital emergency room.[29] (The complaint does not specify whether it is referring to Kaiser Health Plan, Kaiser Hospitals, or both.) In one instance, a NorthBay surgeon assessed and determined that a Kaiser Health Plan enrollee at a NorthBay hospital was not stable and required ongoing emergency medical care, but a doctor with Kaiser's EPRP determined that the enrollee was stable.[30] The EPRP doctor aggressively pressured the NorthBay surgeon to transfer the patient.[31] The NorthBay surgeon refused.[32] The EPRP doctor

---

[24] *Id.* at 17–18 (¶ 53).
[25] *Id.* at 18–19 (¶ 55).
[26] *Id.* at 19 (¶ 56).
[27] *See id.* at 32 (¶ 101).
[28] *Id.* at 4 (¶ 9).
[29] *Id.* at 19 (¶ 58).
[30] *Id.* at 20 (¶ 59).
[31] *Id.*
[32] *Id.*

ORDER – No. 17-cv-05005-LB                    5

sent a facsimile to the NorthBay doctor stating that the patient "is clinically stable and can be transferred to a facility that we designate for all further necessary care" and that any further care that NorthBay provided to the patient would be "unauthorized" "post-stabilization care."[33] (The complaint does not allege what condition this patient had, whether he or she was transferred, or what happened to him or her after this exchange.)

Second, NorthBay alleges two instances where a Kaiser Health Plan enrollee ended up at a Kaiser Hospitals hospital when NorthBay believes that he or she should have ended up at a NorthBay hospital.[34] In one instance, an ambulance drove a Kaiser Health Plan enrollee who was involved in a pedestrian-versus-car accident past NorthBay's Fairfield hospital to Kaiser Hospitals' Vacaville hospital; the patient ultimately died.[35] In another instance, Kaiser Hospitals' Vacaville hospital transferred a Kaiser Health Plan enrollee from Vacaville to Kaiser Hospitals' Vallejo hospital instead of to NorthBay's Fairfield hospital; after the transfer, the patient had to wait nine days for cardiac treatment and was permanently disabled.[36] NorthBay alleges "upon information and belief" that "Kaiser" transferred these patients thusly so that Kaiser Health Plan could avoid paying NorthBay for the two enrollees' treatment.[37] (The complaint does not specify whether it is referring to Kaiser Health Plan, Kaiser Hospitals, or both, and does not allege any more specific facts to support its conclusion about Kaiser's motives, other than the fact of the enrollees' movements.)

Third, NorthBay alleges that when a treating physician determines that a Kaiser Health Plan enrollee's condition is stable and the "Defendants" elect to transfer the enrollee to a Kaiser Hospitals facility, Kaiser Hospitals refuses to effectuate the transfer within "a reasonable amount of time" and instead requires NorthBay to hold the enrollee for hours or days until the Kaiser

---

[33] *Id.*

[34] *See id.* at 20–21 (¶¶ 60–63)

[35] *Id.* at 20 (¶ 61).

[36] *Id.* at 21 (¶ 62).

[37] *See id.* at 20–21 (¶¶ 60-61).

ORDER – No. 17-cv-05005-LB 6

Hospitals facility is ready to receive him or her.[38] NorthBay further alleges that the Kaiser Hospitals hospital does not pay NorthBay's charge-master rates for any non-emergency-but-medically-necessary care that NorthBay provides to the enrollee.[39] (The complaint does not specify to which defendants NorthBay is referring and, if "Defendants" is meant to include Kaiser Hospitals, how it is that Kaiser Hospitals is both electing to transfer the enrollee and refusing to transfer the enrollee.)

### 2.3 Allegations That the Defendants "Steer" Indigent Patients Away From Kaiser Hospitals' Hospitals

Finally, NorthBay alleges that the "Defendants" conspire to divert indigent patients to non-Kaiser-Hospitals hospitals, including NorthBay's hospitals, in order to shift the burden of providing charitable care for those patients (who may not be able to pay the hospitals back) away from Kaiser Hospitals and onto other hospitals.[40] In 2015, NorthBay's two Solano County hospitals provided a total of $56 million in direct charitable care, and 27% of their payer mix were Medi-Cal patients and 6.2% were self-pay/indigent patients, whereas Kaiser Hospitals' two Solano County hospitals provided a total of $5.5 million in direct charitable care, and 7.8% of their payer mix were Medi-Cal patients and 2.2% were self-pay/indigent patients.[41] NorthBay alleges "upon information and belief" that the "Defendants" told the Vacaville Fire Department, which provides emergency medical care and transportation to emergency rooms for crisis and trauma patients, and told other Vacaville paramedics, that patients who do not have Kaiser Health Plan insurance should not be taken to a Kaiser Hospitals hospital and should instead be taken to a non-Kaiser-Hospitals hospital.[42] (The complaint does not specify to which defendants NorthBay is referring, and does not allege any more specific facts to support its conclusion about the defendants' actions vis-à-vis the Vacaville Fire Department or paramedics, other than the figures regarding the amount of charitable care each set of hospitals provided in 2015.)

---

[38] *Id.* at 21 (¶ 63).

[39] *Id.*

[40] *Id.* at 25 (¶ 75).

[41] *Id.* at 24–25 (¶ 73).

[42] *Id.* at 25 (¶ 75).

ORDER – No. 17-cv-05005-LB 7

**ANALYSIS**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a claim for relief above the speculative level . . . ." *Id.* (internal citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, which when accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

If a court dismisses a complaint, it should give leave to amend unless the "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

**1. NorthBay Has Not Pleaded a Cognizable Sherman Act Section 2 Claim**

To plead a conspiracy to monopolize claim under Section 2 of the Sherman Act, a plaintiff "must show four elements: (1) the existence of a combination or conspiracy to monopolize, (2) an overt act in furtherance of the conspiracy, (3) the specific intent to monopolize, and (4) causal antitrust injury." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003)

(citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 224–25 (1947)).[43] In addition, "the complaint must allege that each individual defendant joined the conspiracy and played some role in it because, at the heard of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (citing cases). "[G]eneral allegations as to all defendants . . ., or to a single [collective] corporate entity . . . is insufficient to put specific defendants on notice of the claims against them." *Id.*

NorthBay has failed to plead the existence of a combination or conspiracy to monopolize, the defendants' specific intent to monopolize, or causal antitrust injury.[44] NorthBay's Section 2 claim must therefore be dismissed.

### 1.1 Existence of a Combination or Conspiracy to Monopolize

#### 1.1.1 Governing Law

To plead the existence of a conspiracy, a plaintiff must allege at least two things. First, the plaintiff must allege that the defendants acted in concert. *Granddad Bread, Inc. v. Continental Baking Co.*, 612 F.2d 1105, 1111–12 (9th Cir. 1979). "While Plaintiff's actions need not rule out the possibility that Defendants were acting independently, Plaintiff must allege facts at the pleading stage 'tending to exclude the possibility of independent action.'" *Prime Healthcare*

---

[43] The standard for pleading a conspiracy for the purposes of a claim under Section 2 of the Sherman Antitrust Act is the same as the standard for pleading a conspiracy under Section 1. *See Granddad Bread, Inc. v. Continental Baking Co.*, 612 F.2d 1105, 1111–12 (9th Cir. 1979) ("Although the essential elements of a Section One offense are substantially different than for a Section Two offense, when a combination or conspiracy is charged under Section Two, then a prima facie case under either section has the same prerequisite, that is, a showing of concerted action by the defendants."); *accord, e.g.*, *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-cv-2652-GPC-RBB, 2013 WL 3873074, at *16 (S.D. Cal. July 25, 2013) (where a defendant "has failed to plead the existence of a conspiracy for Section 1 violation, [it] has also failed to satisfy the first element for conspiracy to monopolize under Section 2."), *aff'd*, 642 F. App'x 665 (9th Cir. 2016); *Paladin Assocs., Inc. v. Mont. Power Co.*, 97 F. Supp. 2d 1013, 1039 (D. Mont. 2000) ("The standard for proving a conspiracy under section 2 of the Sherman Act, is the same standard used to prove a conspiracy under section 1 of the Sherman Act.") (citing *Arizona v. Standard Oil of Cal. (In re Petroleum Prods. Antitrust Litig.)*, 906 F.2d 432, 460–65 (9th Cir. 1990)), *aff'd*, 328 F.3d 1145 (9th Cir. 2003).

[44] In light of NorthBay's failure to plead the other three elements, the court need not address whether NorthBay pleaded an overt act in furtherance of the conspiracy.

ORDER – No. 17-cv-05005-LB         9

*Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-cv-2652-GPC-RBB, 2013 WL 3873074, at *7 (S.D. Cal. July 25, 2013) (quoting *Twombly*, 550 U.S. at 544), *aff'd*, 642 F. App'x 665 (9th Cir. 2016). Second, the plaintiff must allege that the defendants acted in concert to monopolize. "Monopoly power — the first element of monopolization — is the power to control prices or exclude competition." *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 993 (9th Cir. 1986) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). It is not enough to plead that the defendants had agreements with each other generally — the defendants must have agreed and conspired to monopolize. *See id.* at 1000 (holding that fact that parties had contractual agreements with one another did not establish a conspiracy to monopolize given that parties did not "share[] . . . a common purpose in monopolizing the . . . market").

### 1.1.2 Application

#### 1.1.2.1 NorthBay has not expressly pleaded the existence of an agreement between the defendants to monopolize

NorthBay claims that it has expressly alleged the existence of an agreement between the defendants.[45] But it has not expressly alleged the existence of an agreement between the defendants to monopolize. What NorthBay has alleged is that the defendants have agreements amongst one another to provide health services that provide for a "contractual flow of money among them."[46] But as NorthBay itself acknowledges, however, "[t]here is nothing inherently wrongful in creating an integrated healthcare delivery system."[47] Pleading the existence of agreements between the defendants to provide health services does not plead the existence of an agreement between the defendants to monopolize.

The case of *Prime Healthcare Services, Inc. v. Service Employees International Union*, No. 11-cv-2652-GPC-RBB, 2013 WL 3873074 (S.D. Cal. July 25, 2013), *aff'd*, 642 F. App'x 665 (9th Cir. 2016), is instructive. In that case, as in this one, a group of hospitals brought a Section 2

---

[45] Pls.' Opp'n – ECF 42-3 at 8.

[46] Compl. – ECF No. 1 at 4 (¶ 7) (alleging "hub-and-spoke" agreements to provide "Health Services"); *see also id.* at 26 (¶ 79).

[47] Pls.' Opp'n – ECF No. 42-3 at 17.

ORDER – No. 17-cv-05005-LB    10

antitrust conspiracy claim (among other claims) against Kaiser Health Plan, Kaiser Hospitals, and the Southern California Permanente Medical Group (among other defendants). The plaintiff hospitals there alleged that the Kaiser defendants entered into agreements among one another to restrain trade, identifying five specific written agreements. *Id.* at *5. The purpose of the agreements, by their express terms, was (among other things) to "increase Kaiser's membership in current and new markets" and "to increase enrollment in the Kaiser Foundation Health Plan." *Id.* at *6. But the court there held that those agreements were insufficient to plead an antitrust conspiracy, as the fact that the defendants agreed among one another to increase their own enrollment did not "suggest any anti-competitive motive, objective or purpose intended to restrain trade." *Id.* at *6, 16 (holding that the rival hospitals' allegations about the agreements were insufficient to plead either a Section 1 or Section 2 conspiracy).

Unlike the plaintiff hospitals in that case, NorthBay here has not even identified any specific written agreements between the defendants. And its allegations that the defendants have generally entered agreements with one another to provide health services or to share revenue do not plead an agreement to monopolize.

### 1.1.2.2 NorthBay's allegations regarding Kaiser Health Plan's cancellation of its Agreement with NorthBay does not give rise to an inference that a conspiracy to monopolize existed

In the absence of an express allegation of an agreement between the defendants to monopolize, NorthBay argues that the court should infer the existence of an agreement between the defendants to monopolize.[48] NorthBay's principal argument is that the defendants have acted against their own self-interest, and because there is no other explanation as to why they would do so, the court should infer that they did so because they had agreed and conspired to create a monopoly.[49] It is true that "[o]ne prominent 'plus factor'" in determining whether the defendants have conspired "is a showing that the defendants' behavior would not be reasonable or explicable (i.e. not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain

---

[48] *See* Pls.' Opp'n – ECF No. 42-3 at 8–9.

[49] *See, e.g.*, Compl. – ECF No. 1 at 31–32 (¶¶ 101–02).

ORDER – No. 17-cv-05005-LB      11

1  trade — that is, that the defendants would not have acted as they did had they not been conspiring in the restraint of trade." *Prime Healthcare*, 2013 WL 3873074, at *7 (citing *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540–42 (1954)). But NorthBay does not actually plead that the defendants acted against their self-interest.

NorthBay primarily focuses on Kaiser Health Plan's 2016 decision to cancel its reimbursement Agreement.[50] It claims that this Agreement was a "mutually beneficial arrangement in which contractually set reimbursement rates prevailed."[51] It then claims that after Kaiser Health Plan cancelled the agreement, "[it] now pays less than *half of the percentage* that it previously paid to NorthBay for treating Kaiser Health Plan patients on an emergency basis."[52] It then curiously argues that "[a]bsent a conspiracy to degrade NorthBay as a competitor, it would be contrary to the self-interest of Defendants to behave in this way," and hence it should be inferred that the defendants entered into a conspiracy to monopolize.[53]

It is hard to see how this theory is plausible. *Cf. Twombly*, 550 U.S. at 570 (to state an antitrust claim, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face"). By NorthBay's own admission, under the Agreement, Kaiser Health Plan used to have to pay NorthBay much more money. After cancelling the Agreement, Kaiser Health Plan now pays NorthBay much less. Far from being somehow against its self-interest, a decision by Kaiser Health Plan to cancel the Agreement and thereby cut its costs in half would be entirely in keeping with its own economic self-interest. This does not suggest the existence of an antitrust conspiracy. *See Kendall*, 518 F.3d at 1049 ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws.").[54]

---

[50] *See id.* at 3 (¶ 5), 31–32 (¶ 101); Pls.' Opp'n – ECF No. 42-3 at 7, 8, 12, 22, 27, 29.

[51] Compl. – ECF No. 1 at 32 (¶ 101).

[52] *Id.* (emphasis in original).

[53] *Id.*

[54] NorthBay may be implicitly making an argument that, after it called the Agreement, Kaiser Health Plan was required to pay it 100% of NorthBay's full charge-master rate, and therefore Kaiser Health Plan acted against its self-interest in cancelling the Agreement and thereby committing itself to paying at a 100% rate rather than at the discounted Agreement rate. *See generally* Compl. – ECF No. 1 at 18

ORDER – No. 17-cv-05005-LB                              12

#### 1.1.2.3 NorthBay's allegations of patient "steering" are conclusory and do not give rise to an inference that a conspiracy to monopolize existed

NorthBay next argues that the defendants "steer" Kaiser Health Plan enrollees to Kaiser Hospitals' hospitals. But NorthBay's "steering" allegations do not include facts from which an agreement or conspiracy to monopolize can be inferred.

First, NorthBay cites an instance where a NorthBay doctor and a Kaiser EPRP doctor disagreed about whether a patient should be transferred.[55] But NorthBay does not allege basic facts regarding this instance, such as what the patient's condition was or why the EPRP doctor's opinion could not have been held in good faith, much less facts that suggest that the Kaiser EPRP doctor's actions evinced an antitrust conspiracy. NorthBay's allegations "could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy," and hence are insufficient to plead an antitrust claim. *Cf. Kendall*, 518 F.3d at 1049.

Next, NorthBay cites to two instances where a Kaiser Health Plan enrollee was transported to one of Kaiser Hospitals' hospital instead of one of NorthBay's.[56] NorthBay alleges "upon information and belief" that the defendants did so in order to avoid having to pay NorthBay for providing services to the enrollee.[57] But "[n]aked assertions made upon information and belief and 'devoid of further factual enhancement are insufficient to state a claim.'" *Oliver v. SD-3C LLC*, No. 11-cv-01260-JSW, 2016 WL 5950345, at *11 (N.D. Cal. Sept. 30, 2016) (quoting *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 926–27 (9th Cir. 2013)). NorthBay does not plead

---

(¶ 55). Kaiser Health Plan responds, however, that in the absence of an agreement, it is not in fact required to pay NorthBay 100% of its full charge-master rate; it need only pay NorthBay the "reasonable and customary" value of the services, as determined by certain California healthcare regulations and the California Department of Managed Health Care. *See* Kaiser Defs. Mot. – ECF No. 39 at 13 (citations omitted) (citing *Children's Hosp. Cent. Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1273 (2014)). NorthBay does not respond to this argument in its Opposition. Kaiser Health Plan could have rationally decided to cancel the Agreement, pay NorthBay only the reasonable-and-customary rate, and be prepared to defend that decision against NorthBay in litigation, rather than acquiescing on the front end and paying NorthBay the Agreement rate. As Kaiser Health Plan's actions "could just as easily suggest rational, legal business behavior," they are insufficient to plead an antitrust conspiracy. *See Kendall*, 518 F.3d at 1049.

[55] Compl. – ECF No. 1 at 20 (¶ 59).

[56] *Id.* at 20–21 (¶¶ 60–62).

[57] *Id.* at 20 (¶ 61).

further factual enhancement supporting an inference that these patient transfers evince an antitrust conspiracy.[58]

NorthBay then claims that Kaiser Health Plan enrollees who are admitted to NorthBay's hospitals are not transferred quickly enough to Kaiser Hospitals' hospitals.[59] Setting aside the contradictory nature of NorthBay's arguments — that an antitrust conspiracy should be inferred from both the fact that defendants are keeping Kaiser Health Plan enrollees away from NorthBay's hospitals and the fact that they are keeping enrollees at NorthBay's hospitals — NorthBay does not support its conclusions with factual allegations from which an antitrust conspiracy can be inferred. If anything, NorthBay alleges a split among the defendants — with some unspecified "Defendants" electing to transfer enrollees but Kaiser Hospitals then refusing to accept the transfers within a reasonable amount of time — which fails to satisfy the requirement of pleading that the defendants were acting in concert at all, much less that they were acting in concert to monopolize. *See Granddad Bread*, 612 F.2d at 1111–12 ("prima facie case" requires "a showing of concerted action by the defendants").

Finally, NorthBay alleges "upon information and belief" that the "Defendants" have told the Vacaville Fire Department and paramedics to transfer patients who lack Kaiser Health Plan insurance to a non-Kaiser-Hospitals hospital.[60] This allegation is wholly conclusory, and NorthBay pleads no facts regarding the defendants' supposed interactions with the Vacaville Fire Department or paramedics at all. In addition, NorthBay improperly groups the defendants together and does not plead facts from which a conspiracy between the defendants can be inferred. *Cf.*

---

[58] The paucity of NorthBay's allegations are made more evident by the Kaiser Defendants' response in their Motion to Dismiss that Solano County's official policies, and not the defendants' supposed machinations, are the reason why certain patients are taken to Kaiser Hospitals' hospital instead of to NorthBay's hospitals. Kaiser Defs. Mot. – ECF 39 at 22 (arguing that Solano County policy requires Level I and II trauma patients to be taken to Kaiser Hospitals' Vacaville hospital or other Level I or II trauma centers and not to NorthBay's hospitals, which are not county-designated Level I or II trauma centers) (citing Kaiser Defs. Mot. Ex. 9 (Solano County Health & Social Services Department Policy Memorandum 5900) – ECF No. 34-2 at 2). NorthBay does not respond to this point in its Opposition or point to factual allegations in its Complaint that explain why the inference that should be drawn from these patients' movements is instead that an antitrust conspiracy necessarily existed.

[59] Compl. – ECF No. 1 at 21 (¶ 63).

[60] *Id.* at 25 (¶ 75).

*TFT-LCD*, 586 F. Supp. 2d at 1117 (N.D. Cal. 2008) ("[T]he complaint must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it. . . . [G]eneral allegations as to all defendants . . . [are] insufficient to put specific defendants on notice of the claims against them.") (citations and internal quotation marks omitted).

### 1.2 Specific Intent to Monopolize

#### 1.2.1 Governing Law

To plead specific intent, a plaintiff must allege that the defendants had the intent to monopolize, i.e., "an intent to exclude competition or control prices." *Stanislaus Food Prods. Co. v. USS-Posco Indus.*, 782 F. Supp. 2d 1059, 1078 (E.D. Cal. 2011) (citing *Carpet Seaming Tape Licensing Corp. v. Best Seam, Inc.*, 616 F.2d 1133, 1141–42 (9th Cir. 1980); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 789 (1946)). "A specific intent to destroy competition or build monopoly is essential." *Id.* (citing *Times-Picayune Pub. Co. v. United States*, 345 U.S. 595, 626 (1953)). "Thus, plaintiff must allege 'specific intent' to ultimately seize monopoly power within the relevant market." *Id.* Conclusory allegations are insufficient to withstand a motion to dismiss. *See, e.g.*, *id.* at 1079 (dismissing Section 2 conspiracy claim where "Plaintiff's conclusory allegation of specific intent does not allege the facts in which defendants intended and did drive out independent competitors.").

If a plaintiff brings a conspiracy claim against multiple defendants, it must plead that each such defendant had a specific intent to monopolize. *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1437 n.8 (9th Cir. 1995) ("To prove a conspiracy to monopolize, [plaintiff] must show that [alleged coconspirators] had the specific intent to conspire to monopolize; it is not enough to show that [they] merely agreed to go along" with one defendant's scheme) (citing *Belfiore v. N.Y. Times Co.*, 826 F.2d 177, 183 (2d Cir. 1987)); *accord, e.g.*, *SuperTurf Inc. v. Monsanto Co.*, 660 F.2d 1275, 1283 (8th Cir. 1981) ("[A] 'conspiracy to monopolize' claim requires a showing of defendant's specific intent to monopolize. Moreover, it must be shown that the defendant's alleged coconspirators . . . shared its specific intent to create a monopoly . . . .") (citing *Am. Tobacco Co.*

*v. United States*, 328 U.S. 781, 810 (1945)); *In re TFT-LCD*, 586 F. Supp. 2d at 1117 ("[T]he complaint must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it.") (citations and internal quotation marks omitted).

### 1.2.2 Application

NorthBay pleads no non-conclusory facts supporting an inference that the defendants had the specific intent to monopolize. At most, NorthBay alleges that the defendants were acting with the intent of increasing their revenues and/or reducing their costs, including by reducing what they paid to NorthBay. But the fact that the defendants might have wanted to pay NorthBay less money does not plead that the defendants had the specific intent to seize monopoly power, exclude competition, or control prices. *See generally Aerotec Int'l v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) ("Competitors are not required to engage in a lovefest; indeed, '[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws.' . . . By its very terms, § 2 of the Sherman Act regulates anti-competitive conduct, not merely anticompetitive aspirations or an independent decision on terms of dealing with a competitor.") (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993)).

Again, *Prime Healthcare* is instructive. The plaintiff hospitals there alleged that Kaiser Health Plan, Kaiser Hospitals, and the Southern California Permanente Medical Group "refus[ed] to pay claims for treatment of Kaiser members at [plaintiff] hospitals," initiated "sham counterclaims in litigation to recover payment for treating Kaiser members," and "refus[ed] to pay physicians who provide emergency services to Kaiser members at [plaintiff] hospitals." *Prime Healthcare*, 2013 WL 3873074, at *13. But, as the court there held, those allegations did not plead that "the Defendants intended to harm trade or Defendants' actions caused injury to overall competition" and hence failed to plead a specific intent to monopolize. *Id.* at *13–14.

NorthBay's allegations here are similar — and similarly fail to plead that the defendants had the specific intent to monopolize, as opposed to simply the intent to increase their own revenues

1 and decrease what they had to pay to NorthBay. This is insufficient to plead an antitrust conspiracy claim.[61]

### 1.3 Causal Antitrust Injury

#### 1.3.1 Governing Law

"In addition to the traditional limitations upon standing imposed by the Constitution, Congress imposed additional limitations upon those who can recover damages under the antitrust laws." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485–86 (1977)). "These limitations are sometimes referred to as the antitrust standing requirements." *Id.* (citing *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999)). "The most important limitation is that the private party 'must prove the existence of '*antitrust* injury.'" *Id.* (emphasis in original) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

"To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Rebel Oil*, 51 F.3d at 1433 (citing *USA Petroleum*, 495 U.S. at 334). Antitrust injury can include higher prices to consumers, lower output, reduced quality, or the foreclosure of competition. *See Pool Water*, 258 F.3d at 1034. But "[i]f the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se." *Id.* (citing *USA Petroleum*, 495 U.S. at 334). "Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Paladin*, 328 F.3d at 1158 (citing *MetroNet Servs. v. U.S. West*, 325 F.3d 1086 (9th Cir. 2003); *Pool Water*, 258 F.3d at 1034–36). This is because the "[a]ntitrust laws are designed to protect competition, not competitors." *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 951 (9th

---

[61] In light of NorthBay's failure to plead specific intent to monopolize generally, the court need not address whether NorthBay satisfied its requirement to plead specific intent as to each defendant.

ORDER – No. 17-cv-05005-LB 17

Cir. 1998) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990)). "[R]emoval of one or a few competitors need not equate with injury to competition. . . . [C]laimants must plead and prove a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989) (citing cases).

### 1.3.2 Application

NorthBay does not allege any antitrust injury or harm to competition generally. It alleges injury only to itself.

NorthBay complains that the defendants' conduct impairs its ability to invest in newer medical services and technologies and thereby impairs its ability to compete.[62] This may give NorthBay standing to assert an individual commercial dispute claim. But this does not give it standing to assert a claim for antitrust conspiracy.

Once again, *Prime Healthcare* is instructive. The court there held that the plaintiff hospitals' allegations that Kaiser Health Plan, Kaiser Hospitals, and the Southern California Permanente Medical Group refused to pay claims for treatment of Kaiser Health Plan enrollees at the plaintiff's hospitals and initiated litigation against hospitals to recover for payments did not plead an antitrust injury:

> [Plaintiff] has not sufficiently stated that the Defendants' actions actually injured competition. Plaintiff fails to plead supportive facts beyond conclusory statements that, as a result of Defendants['] actions, [plaintiff] or other hospitals were injured or pushed out of the relevant market, or that consumers actually faced higher prices, reduced quality of care and quantity of services, and reduced choice as a result of the Defendants' actions. Any resources [plaintiff] spent as a result of the Defendants' actions . . . do not show actual injury to competition. Thus, the alleged injury incurred by Kaiser Defendants' refusal to pay claims for [plaintiff]'s services, the Defendants' initiation of purported sham litigation, or [plaintiff]'s costs in defending itself in government investigations show only potential harm to [plaintiff] alone. There are no non-conclusory allegations that Defendants' actions restrained trade in the relevant market or injured overall competition.

*Prime Healthcare*, 2013 WL 3873074, at *13. NorthBay's allegations fail for the same reason — they may plead an injury to NorthBay, but they do not plead an injury to competition as a whole.

---

[62] *See* Compl. – ECF No. 1 at 31 (¶¶ 97–98).

As NorthBay has failed to plead the essential elements of an antitrust conspiracy, its claim under Section 2 of the Sherman Antitrust Act must be dismissed.

## 2. The Court Declines to Exercise Supplemental Jurisdiction Over NorthBay's Remaining Claims

If a court dismisses all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367(c). "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The remainder of NorthBay's claims arise under state law. There is no diversity of citizenship,[63] and hence the court does not have original jurisdiction over these claims. In light of these facts, and given that the litigation is at its earliest stages, the court declines to exercise supplemental jurisdiction over the remainder of NorthBay's claims.

## CONCLUSION

For the foregoing reasons, the court (1) dismisses NorthBay's claim under Section 2 of the Sherman Antitrust Act for failure to state a claim, and (2) declines to exercise supplemental jurisdiction over the remainder of NorthBay's claims and dismisses them for lack of jurisdiction. NorthBay may file an amended complaint on or before Thursday, January 11, 2018 that asserts a

---

[63] All parties are citizens of California. Compl. – ECF No. 6–7 (¶¶ 12–13, 16–18).

cognizable claim over which the court has original jurisdiction. If it does not do so, the court will direct the clerk of court to close this case.

**IT IS SO ORDERED.**

Dated: December 7, 2017

_____
LAUREL BEELER
United States Magistrate Judge