UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| NORTHBAY HEALTHCARE GROUP, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> KAISER FOUNDATION HEALTH PLAN, INC., et al., <br><br> Defendants. | Case No. 17-cv-05005-LB <br><br> **ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS** <br><br> Re: ECF No. 65, 67 |

## INTRODUCTION

Plaintiffs NorthBay Healthcare Group and NorthBay Healthcare Corporation (collectively, "NorthBay") operate two hospitals in Solano County, California. NorthBay brings this action against (1) Kaiser Foundation Health Plan, Inc. ("Kaiser Health Plan"), a health insurer; (2) Kaiser Foundation Hospitals, Inc. ("Kaiser Hospitals"), the operator of two other hospitals in Solano County; and (3) the Permanente Medical Group, Inc. ("Permanente"), which manages doctors that work at Kaiser Hospitals' hospitals. NorthBay alleges violations of the Sherman Antitrust Act and various California state-law claims.

The court previously granted the defendants' motion to dismiss NorthBay's original complaint, holding that NorthBay had failed to plead a violation of the federal antitrust laws and declining to exercise supplemental jurisdiction over NorthBay's state-law claims. *NorthBay*

*Healthcare Grp. v. Kaiser Found. Health Plan, Inc.*, No. 17-cv-5005-LB, 2017 WL 6059299 (N.D. Cal. Dec. 7, 2017) (*NorthBay I*). The court granted leave for NorthBay to amend its complaint.

NorthBay filed a First Amended Complaint ("FAC"). But the FAC still fails to plead a cognizable antitrust claim. Among its other deficiencies, the FAC fails to plead that NorthBay suffered any causal antitrust injury. The court dismisses NorthBay's antitrust claims and declines to exercise supplemental jurisdiction over NorthBay's state-law claims, and therefore dismisses NorthBay's FAC in full, with leave to amend.

## STATEMENT[1]

### 1. The Defendants

Defendant Kaiser Health Plan is the largest health-care-service plan in the United States.[2] Over 11.8 million people in nine states and the District of Columbia are enrolled in health insurance from Kaiser Health Plan.[3] In Northern California, over 4.1 million people are enrolled in Kaiser Health Plan.[4] Kaiser Health Plan has a market share of 86% of the commercial insureds in Solano County in 2016 and 88% in 2017.[5]

Defendant Kaiser Hospitals operates hospitals throughout the United States, including two hospitals with emergency departments in Solano County: Kaiser Permanente Vallejo Medical Center in Vallejo and Kaiser Permanente Vacaville Medical Center in Vacaville.[6] Kaiser Hospitals' Vacaville hospital is the county-designated Level II Trauma Center for Solano County.[7]

---

[1] Unless otherwise noted, the fact allegations in the Statement are from the FAC.

[2] FAC – ECF No. 62 at 10 (¶ 15). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[3] *Id.*

[4] *Id.*

[5] *Id.* at 2 (¶ 2), 39 (¶ 104), 42 (¶ 116).

[6] *Id.* at 10 (¶ 16).

[7] *Id.* at 15 (¶ 31), 17 (¶ 36).

Defendant Permanente is a medical group comprised of physician-owned, for-profit partnerships and professional corporations.[8] Permanente provides and manages the physicians who service Kaiser Health Plan enrollees at Kaiser Hospitals' hospitals, including Kaiser Hospitals' Vallejo and Vacaville hospitals.[9]

Kaiser Health Plan, Kaiser Hospitals, and Permanente are "separate legal entities" and "separate economic actors."[10] They are parties to legal agreements with one another, however, whereby Permanente doctors service Kaiser Health Plan enrollees at Kaiser Hospitals.[11] The three defendants collectively use the registered trademark or trade name "Kaiser Permanente."[12] Kaiser Hospitals has noted that "separate legal entities are responsible for managing the integrated health care system in California: [Kaiser Health Plan]; [Kaiser Hospitals]; and The Permanente Medical Group, Inc. (TPMG), which contracts with [Kaiser Health Plan] in Northern California."[13]

### 2. NorthBay's Allegations

NorthBay operates two hospitals in Solano County: NorthBay Medical Center in Fairfield and NorthBay VacaValley in Vacaville.[14] NorthBay's Fairfield hospital is a county-designated Level III Trauma Center.[15]

#### 2.1 Kaiser Hospitals Cancelled a Services Agreement with NorthBay in 2016

NorthBay's hospitals provide emergency medical services to patients, including Kaiser Health Plan enrollees.[16] Since 2010, the number of Kaiser Health Plan enrollees treated by NorthBay each

---

[8] *Id.* at 10 (¶ 17).
[9] *Id.*
[10] *Id.* at 8–9 (¶ 9), 11 (¶ 18), 12 (¶ 25), 41 (¶ 112).
[11] *Id.* at 30 (¶ 76).
[12] *Id.* at 2 (¶ 1), 11 (¶ 18), 28 (¶ 70).
[13] *Id.* at 11 (¶ 18).
[14] *Id.* at 9 (¶ 11), 15 (¶ 31).
[15] *Id.* at 15 (¶ 31).
[16] *Id.* at 16 (¶ 33).

year has steadily increased, rising from more than 540 patients in 2010 to over 770 patients in 2016 and 889 patients in 2017.[17]

In 2010, NorthBay and Kaiser Hospitals entered into an Agreement for Non-Referral Hospital Services for Kaiser Permanente Members ("Agreement").[18] The Agreement set forth the rates that Kaiser Health Plan would pay NorthBay for emergency medical services NorthBay provided to Kaiser Health Plan enrollees.[19] (It is unclear how an agreement between NorthBay and Kaiser *Hospitals* could bind Kaiser *Health Plan* with respect to paying NorthBay, but that is what the FAC alleges.[20])

On May 20, 2016, NorthBay received a letter on "Kaiser Permanente" letterhead announcing the termination of the Agreement effective September 18, 2016.[21] The letter referred to Kaiser Hospitals' and "Kaiser Permanente"'s expectation that NorthBay would not seek reimbursement from any "member" of Kaiser Health Plan.[22] The letter did not provide an explanation on behalf of Kaiser Hospitals (or any other person or entity) for the termination.[23] The letter stated, among other things, "[w]e appreciate the relationship we have enjoyed over the last several years, and would be happy to discuss ways we can continue working productively together to advance Kaiser Permanente's mission of providing high-quality, affordable health care services and improving the health of our members and the communities we serve."[24]

---

[17] *Id.*

[18] *See id.* at 5–6 (¶ 5.e), 26 (¶ 63).

[19] *Id.* at 5–6 (¶ 5.e).

[20] *Id.* ("The Agreement . . . itself was between Kaiser Foundation *Hospitals* and NorthBay, and provided that Kaiser Foundation *Health Plan* would reimburse NorthBay at a contractually prescribed rate for providing its insureds with emergency medical services.") (emphasis added). In its original complaint, NorthBay alleged that this Agreement was between NorthBay and Kaiser Health Plan, not Kaiser Hospitals. Compl. – ECF No. 1 at 15 (¶ 48) ("In 2010, NorthBay and Kaiser Health Plan entered into an Agreement for Non-Referral Hospital Services for Kaiser Permanente Members."). In the FAC, however, this has been changed to Kaiser Hospitals.

[21] FAC – ECF No. 62 at 6 (¶ 5.e), 26–27 (¶ 64).

[22] *Id.* at 6 (¶ 5.e), 26–27 (¶ 64).

[23] *Id.* at 6 (¶ 5.e), 26–27 (¶ 64).

[24] *Id.* at 6 (¶ 5.e), 27 (¶ 64).

Shortly after September 20, 2016, Kaiser Health Plan began reimbursing NorthBay at less than half the rate specified in the 2010 Agreement.[25] NorthBay alleges that Kaiser Health Plan has refused to pay reasonable-and-customary rates for services NorthBay provided to Kaiser Health Plan enrollees.[26]

According to NorthBay, there is no legal limit on the billing rates that hospitals in California can set to charge for their services.[27] Hospitals can charge whatever rates they want — the only limitation upon them are market forces.[28] According to NorthBay, if a hospital does not have a contract with a payer, the payer is billed and is expected to pay at the hospital's full billing rates.[29] NorthBay claims that following the termination of the Agreement, NorthBay was not required to accept anything less than full payment at its full billing rates from Kaiser Health Plan.[30] NorthBay calculates that since the termination of the Agreement, Kaiser Health Plan has underpaid it more than $26.8 million for services it provided to Kaiser Health Plan enrollees.[31]

### 2.2 Kaiser Hospitals "Steers" Trauma Patients to Its Hospitals

Solano County designates hospital trauma facilities to provide certain levels of services.[32] For example, Level II facilities must have specialty surgeons on call.[33]

When paramedics arrive on scene to transport a patient to a medical facility, they must "activate" trauma services if the patient meets certain medical criteria.[34] Upon activation, the paramedic calls the "trauma base station," where a physician assesses the patient's medical

---

[25] *Id.* at 6 (¶ 5.f), 43 (¶ 119).
[26] *Id.* at 27 (¶ 65).
[27] *Id.* at 37 (¶¶ 97, 100).
[28] *Id.* (¶¶ 99–100).
[29] *Id.* at 37–38 (¶ 100).
[30] *Id.* at 27 (¶ 66).
[31] *Id.* (¶ 67).
[32] *Id.* at 20 (¶ 45).
[33] *Id.*
[34] *Id.*

condition and routes the ambulance either to a Level II or III designated trauma facility.[35] If a trauma patient has Level II injuries (like a gunshot wound to the head or severe blunt head injury), the trauma base hospital must route the patient to the county-designated Level II trauma center — i.e., Kaiser Hospitals' Vacaville hospital.[36] If a trauma patient has Level III injuries, the trauma base hospital must route the patient to the nearest Level III trauma facility.[37]

In October 2016, Kaiser Hospitals successfully lobbied Solano County to designate its Vacaville hospital as the county's base hospital for trauma care.[38] NorthBay alleges that Kaiser Hospitals' Vacaville hospital "regularly uses its routing power in order to route Level III trauma patients to harm rival hospitals."[39] NorthBay's FAC does not allege any examples of this practice, however. It cites to three examples of patients being transported to Kaiser Hospitals — but it does not allege that any of these patients were Level III trauma patients. NorthBay therefore does not allege any examples of the supposed Level-III-patient steering of which it complains.[40] (To the contrary, in its Opposition, NorthBay expressly states that at least one of these three patients was a Level II trauma patient and therefore was *not* an example of Level-III-patient steering.[41])

### 2.3 Permanente Doctors Call Emergency Medical Providers for Kaiser Health Plan Enrollees to Take Them to Kaiser Hospitals

NorthBay alleges that "Kaiser Permanente" maintains an on-call urgent-care line and implicitly alleges that the line is staffed by Permanente on-call physicians.[42] Patients with acute-care conditions that require immediate medical assistance often call this urgent-care line for

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.* (¶ 44).

[39] *Id.* (¶ 46).

[40] *See id.* at 21–22 (¶¶ 47–49).

[41] Pls.' Opp'n to Kaiser Defs. Mot. – ECF No. 73 at 23 ("The FAC speaks for itself, and the Court will see that it never — not once — alleges that the September example involved a Level III patient. To the contrary, the FAC openly acknowledged that the patient was Level II.").

[42] FAC – ECF No. 62 at 22 (¶ 50).

confirmation that they should seek immediate acute-care medical services.[43] NorthBay asserts that county guidelines specify that if the on-call physician determines that a Kaiser Health Plan enrollee needs emergency medical transportation, the physician should instruct the patient to hang up and dial 911 for emergency transportation routing in accordance with the county's emergency-routing protocol.[44] NorthBay alleges that Permanente physicians that staff the on-call urgent-care line instead routinely directly call emergency transportation providers for patients (instead of making the patient hang up and call 911) and route the providers to patients' houses with instructions to take patients to a Kaiser Hospitals facility.[45] NorthBay states that Permanente does this to ensure that Kaiser Health Plan enrollees stay within the "Kaiser Permanente" system.[46] (NorthBay does not provide any facts to support its allegation that this "routinely" happens. NorthBay also does not explain why this would be improper, nor does it allege that Kaiser Health Plan enrollees who dialed 911 would not be taken to Kaiser Hospitals facilities anyway.[47])

### 2.4 Kaiser Hospitals "Steers" Underinsured Patients Away From Its Hospitals

NorthBay alleges that Kaiser Hospitals steers underinsured and uninsured patients away from its hospitals to NorthBay's.[48] It cites two examples in support of these allegations:

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] The Solano County's policy memorandum of destination protocols for ambulances states that non-critical patients can choose which hospital their care is to be given — and that if they cannot communicate their choice, the transportation personnel should "use whatever other sources of information that might be available to indicate a pre-existing relationship" between the patient and a particular hospital. Kaiser Defs. Mot. Ex. D (Solano County Health & Social Services Department Policy Memorandum 6700) – ECF No. 67-7 at 3 (¶ II.D), 4 (¶ III.B), 5 (¶ IV.B). The court may take judicial notice of this memorandum because (1) NorthBay's FAC relies on Solano County's emergency-transport routing protocols, *see* FAC – ECF No. 62 at 22 (¶ 50), and hence the memorandum establishing the protocols can be considered under the incorporation-by-reference doctrine, *Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005), and (2) the memorandum is an official government document that is a matter of public record, *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

[48] FAC – ECF No. 62 at 23 (¶ 52).

First, NorthBay cites to an instance where Kaiser Hospitals called to inform NorthBay that it was transferring a homeless patient to NorthBay.[49] Kaiser Hospitals told NorthBay that the patient had received cancer treatment with NorthBay, had Partnership HealthPlan, and was "assigned" to NorthBay.[50] After obtaining the patient's detailed information from Kaiser Hospitals, NorthBay saw that the patient had state Medi-Cal coverage.[51] NorthBay also saw that the patient had been to NorthBay only once and had not been treated for cancer there.[52] NorthBay alleges that Kaiser Hospitals wanted to avoid the cost of treating this patient and sought to shift that burden onto NorthBay.[53] (NorthBay does not allege what happened with this patient or whether he actually was transferred or not.)

Second, NorthBay cites to an instance where Kaiser Hospitals called NorthBay about a patient with abdominal pain and questionable kidney failure.[54] Kaiser Hospitals insisted that NorthBay take the patient because he had established care with NorthBay as his primary hospital and indicated that its own emergency department was full.[55] NorthBay asserts that the patient had not in fact established NorthBay as his primary hospital.[56] NorthBay also alleges that the patient had Medicare A & B coverage with minimal AARP secondary insurance, and as a result, Kaiser

---

[49] *Id.* at 23 (¶ 53).

[50] *Id.*

[51] *Id.* NorthBay intimates that Kaiser Hospitals misrepresented the patient's insurance coverage by telling NorthBay that the patient had Partnership HealthPlan, not Medi-Cal. *See id.* ("After obtaining the face sheet from Kaiser Vacaville, which includes detailed patient information, NorthBay saw that the patient had state MediCal coverage (not Partnership Healthplan) . . . ."). But in fact Partnership HealthPlan is just the name of the Medi-Cal health plan for Solano County. *See* California Dep't of Health Care Servs., Medi-Cal Managed Care Health Plan Directory, http://www.dhcs.ca.gov/individuals/Pages/MMCDHealthPlanDir.aspx (last visited Mar. 30, 2018). The court may take judicial notice of the fact that Partnership HealthPlan is the name of the Medi-Cal health plan for Solano County as a matter of public record. *Lee*, 250 F.3d at 688–89.

[52] FAC – ECF No. 62 at 23 (¶ 53).

[53] *Id.*

[54] *Id.* (¶ 54).

[55] *Id.*

[56] *Id.*

Hospitals did not want to take on the financial costs of his care.[57] (Again, NorthBay does not allege what happened with this patient or whether he actually was transferred or not.)[58]

**STANDARD OF REVIEW**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a claim for relief above the speculative level . . . ." *Id.* (internal citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, which when accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

---

[57] *Id.*

[58] In its original complaint, NorthBay alleged "upon information and belief" that the defendants conspired with the Vacaville Fire Department, which provides emergency medical care and transportation to emergency rooms for crisis and trauma patients, and that the defendants told them that patients who do not have Kaiser Health Plan insurance should not be taken to a Kaiser Hospitals hospital and should instead be taken to a non-Kaiser-Hospitals hospital. These allegations are not in the FAC.

ORDER – No. 17-cv-05005-LB                    9

If a court dismisses a complaint, it should give leave to amend unless the "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

## ANALYSIS

### 1. Governing Law

Causal antitrust injury is an essential element of both a monopolization claim and a conspiracy-to-monopolize claim under Section 2 of the Sherman Antitrust Act. *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010) (causal antitrust injury is an element of a monopolization claim, along with (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power) (quoting *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 735 (9th Cir. 1979)); *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) (causal antitrust injury is an element of a conspiracy-to-monopolize claim, along with (1) existence of a combination or conspiracy to monopolize, (2) an overt act in furtherance of the conspiracy, and (3) the specific intent to monopolize) (citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 224–25 (1947)). Because "causal antitrust injury is a substantive element of an antitrust claim, . . . the fact of injury or damage must be alleged at the pleading stage." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).

"'Antitrust injury' means 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Somers*, 729 F.3d at 963 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Antitrust injury has five elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, . . . (4) that is of the type the antitrust laws were intended to prevent," and (5) that "the injured party be a participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Id.* (citations and internal quotation marks omitted).

"It is not enough to show that one's injury was caused by illegal behavior." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2011) (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109 (1986); *Brunswick*, 429 U.S. at 485–86). "'To show antitrust injury, a plaintiff must prove that his loss flows from an *anticompetitive* aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition.'" *Id.* (emphasis in original) (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995)). "'If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se.'" *Id.* (citing *Rebel Oil*, 51 F.3d at 1433). Among other things, "[a] decrease in one competitor's market share . . . affects competitors, not competition. . . . Increased concentration may make anticompetitive action more likely, but in and of itself it does not amount to antitrust injury." *Id.* at 1036 (citing *Cargill*, 479 U.S. at 116; *Brunswick*, 429 U.S. at 486–87); *accord Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 ("[R]emoval of one or a few competitors need not equate with injury to competition. . . . [C]laimants must plead and prove a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market.") (citing cases).

## 2. Application

### 2.1 NorthBay Fails to Plead Injury of the Type the Antitrust Laws Were Intended to Prevent

NorthBay's claims fail because it has not pleaded injury of the type the antitrust laws were intended to prevent. As the court previously held with respect to NorthBay's original complaint, "NorthBay does not allege any antitrust injury or harm to competition generally. It alleges injury only to itself." *NorthBay I*, 2017 WL 6059299, at *9. This is insufficient to plead an antitrust claim.

NorthBay's FAC fares no better. With respect to its complaints about the 2010 Agreement, NorthBay's allegations, at their core, are that the defendants should give it — NorthBay — more money so that it — NorthBay — can invest more money in its — NorthBay's — chosen

1  projects.[59] This does not plead an injury to competition as a whole. *See Pool Water*, 258 F.3d at

2  1036; *Les Shockley*, 884 F.2d at 508.

3  As the court noted in its prior dismissal order, another court addressed similar allegations by

4  hospitals that alleged (like NorthBay does here) that Kaiser Health Plan, Kaiser Hospitals, and a

5  Permanente Medical Group (there, the one in Southern California) supposedly engaged in a

6  monopoly conspiracy because they refused to pay what the hospitals billed them to treat Kaiser

7  Health Plan enrollees. In a decision that was affirmed by the Ninth Circuit, the court there

8  dismissed the hospitals' claims, holding that (among other things) the hospitals failed to plead an

9  antitrust injury:

> [Plaintiff] has not sufficiently stated that the Defendants' actions actually injured competition. Plaintiff fails to plead supportive facts beyond conclusory statements that, as a result of Defendants['] actions, [plaintiff] or other hospitals were injured or pushed out of the relevant market, or that consumers actually faced higher prices, reduced quality of care and quantity of services, and reduced choice as a result of the Defendants' actions. Any resources [plaintiff] spent as a result of the Defendants' actions . . . do not show actual injury to competition. Thus, the alleged injury incurred by Kaiser Defendants' refusal to pay claims for [plaintiff]'s services . . . show only potential harm to [plaintiff] alone. There are no non-conclusory allegations that Defendants' actions restrained trade in the relevant market or injured overall competition.

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-cv-2652-GPC-RBB, 2013 WL 3873074, at *13 (S.D. Cal. July 25, 2013), *aff'd*, 642 F. App'x 665 (9th Cir. 2016). The analysis in that case was compelling when the court issued its first dismissal order, *NorthBay I*, 2017 WL 6059299, at *9–10, and it remains compelling now. As the *Prime Healthcare* court held, allegations of this sort do not plead an antitrust injury.[60]

---

[59] FAC – ECF No. 62 at 7 (¶ 6), 34 (¶ 87), 36 (¶¶ 94–95).

[60] NorthBay attempts to distinguish *Prime Healthcare* by claiming that it "involved a far-fetched conspiracy to eliminate non-unionized hospitals allegedly effected through collective bargaining and a labor-management agreement." Pls.' Opp'n to Permanente Mot. – ECF No. 75 at 22. While some of the allegations in *Prime Healthcare* involved labor agreements, the plaintiff there also made allegations that the "Kaiser Defendants[] refus[ed] to pay claims for treatment of Kaiser members at Prime hospitals" and "refus[ed] to pay physicians who provide emergency services to Kaiser members at Prime hospitals," *Prime Healthcare*, 2013 WL 3873074, at *13, analogous to the allegations NorthBay makes here.

ORDER – No. 17-cv-05005-LB  12

United States District Court
Northern District of California

Nor do NorthBay's "steering" allegations plead an antitrust injury. "Naked assertions . . . 'devoid of further factual enhancement' are insufficient to state a claim." *Oliver v. SD-3C LLC*, No. 11-cv-01260-JSW, 2016 WL 5950345, at *11 (N.D. Cal. Sept. 30, 2016) (quoting *Blantz v. Cal Dep't of Corr. & Rehab.*, 727 F.3d 917, 926–27 (9th Cir. 2013)).[61] As was the case in its original complaint, NorthBay's allegations of steering in its FAC lack factual enhancement and are conclusory.

NorthBay claims that Kaiser Hospitals steers Level III trauma patients who are Kaiser Health Plan enrollees to its own hospitals instead of to NorthBay. But NorthBay pleads no facts to support that conclusion: it does not cite a single example of a Level III patient that was actually steered to Kaiser Hospitals or away from NorthBay. NorthBay cites to an instance where a Level *II* patient was allegedly steered to Kaiser Hospitals and then concludes that "if that [steering] practice is true of Level II patients, then it is equally true of Level III patients."[62] NorthBay points to no allegations of fact that support that conclusion, which does not logically follow from any allegation in its FAC. As NorthBay itself pleads, "if a trauma patient had Level II injuries . . ., the trauma base station *must* route the patient to the county's Level II designated trauma center — which, in Solano County is Kaiser Vacaville."[63] Consequently, NorthBay's allegation that a Level II patient was steered to Kaiser Hospitals — which is required by county regulations — does not support its conclusion that Level III patients are "steered" in the same way.[64]

---

[61] The fact that an assertion devoid of factual enhancement might not include the words "upon information and belief" does not make it non-conclusory or render it sufficient to state a claim.

[62] Pls.' Opp'n to Kaiser Defs.' Mot. – ECF No. 83 at 24.

[63] FAC – ECF No. 62 at 20 (¶ 45) (emphasis added).

[64] The court also has questions about whether allegations that Kaiser Health Plan enrollees were steered to Kaiser Hospitals would plead an antitrust injury to NorthBay even assuming (counterfactually) that such allegations were non-conclusory. Implicit in NorthBay's theory that it suffered an antitrust injury is a presumption that, but for the steering, it has an entitlement to service (and charge) those enrollees for treatment of trauma injuries. It is not clear what the basis for this entitlement is. NorthBay is not, for example, entitled to Kaiser Health Plan enrollees' business if those enrollees choose to go instead to Kaiser Hospitals for outpatient medical care. *Cf. Barry v. Blue Cross of Cal.*, 805 F.2d 866, 872 (9th Cir. 1986) ("When a consumer contracts to buy services from one health plan, the consumer will then have little or no demand for the services of a nonparticipating physician, especially if the consumer would have to pay more for these services. The contract does not mean that the parties have agreed to an unlawful concerted refusal to deal. . . . Ordinary competitive
*(cont'd)*

1    NorthBay's allegations that Kaiser Hospitals steers uninsured or underinsured patients away from itself and onto NorthBay are similarly conclusory. NorthBay cites two examples where Kaiser Hospitals allegedly "insisted" on transferring patient to NorthBay. But NorthBay notably does not allege that either patient actually *was* transferred to NorthBay. And if the patients were not transferred, NorthBay would not have borne any costs associated with their care and hence would have suffered no injury, much less any antitrust injury. NorthBay pleads no facts to support its conclusion that Kaiser Hospitals steered uninsured or underinsured patients onto NorthBay.

### 2.2   NorthBay Fails to Plead That It Suffered Antitrust Injury Itself

Even assuming NorthBay had pleaded an injury of the type the antitrust laws were intended to prevent, its claims would fail because it does not plead that it suffered that antitrust injury itself.

Fundamentally, what NorthBay is alleging (aside from individualized grievances such as its complaints about the 2010 Agreement) is not antitrust injury to itself but injury to a third party — a health insurer called Western Health Advantage ("WHA"), of which NorthBay owns 50%[65] — that competes with Kaiser Health Plan. NorthBay alleges that "[b]ut for Defendants' steering practices and providing less than half the appropriate reimbursement rates to NorthBay, WHA would likely have a larger share of the healthcare insurance market in Solano County today and would more effectively constrain Kaiser Foundation Health Plan."[66] But WHA is not a party to this action, and NorthBay cannot use WHA as a substitute for its requirement to plead that it — NorthBay — suffered antitrust injury. *Somers*, 729 F.3d at 963 (plaintiff must plead "injury *to the plaintiff*") (emphasis added); *see also J. Allen Ramey, M.D., Inc. v. Pac. Found. for Med. Care*,

---

market forces — lower prices — have simply reduced the demand for the nonparticipating physician's services."). It is not clear why NorthBay would have any more of an entitlement to Kaiser Health Plan enrollees' business if those enrollees suffer a trauma injury.

[65] FAC – ECF No. 62 at 9 (¶ 14).

[66] *Id.* at 8 (¶ 8); *see also, e.g.*, Pls.' Opp'n to Kaiser Defs. Mot. – ECF No. 73 at 28 ("The FAC alleges that but for Defendants' actions, 'WHA would likely have a larger share of the healthcare insurance market in Solano County today and would more effectively constrain Kaiser Foundation Health Plan.'"); Pls.' Opp'n to Permanente Mot. – ECF No. 75 at 26 ("Defendants responded to their health plan's diminishing power in Solano County by attacking Kaiser Foundation Health Plan's only significant competitor, WHA.").

999 F. Supp. 1355, 1364 (S.D. Cal. 1998) (noting that "reduction of competition does not invoke the Sherman Antitrust Act until it harms consumer welfare" and holding that even if a medical provider could establish that a PPO program could drive it out of business, the antitrust claim "is not Plaintiff's to make").[67]

If anything, NorthBay may have pleaded itself out of a claim. According to NorthBay, it can set its billing rates for its services at whatever level it wants — and in the absence of a negotiated agreement, patients and insurance companies are required to pay NorthBay at those rates.[68] Given this allegation, NorthBay suffers no antitrust injury: even if Kaiser Health Plan were trying to monopolize the health-insurance market, NorthBay — which is not a health insurer — would still be free to set its hospital billing rates at whatever level it wants and demand that Kaiser Health Plan pay them.[69] If there is an antitrust violation here, it is not one that injures NorthBay, and hence it is not NorthBay's claim to make.[70]

The Third Circuit's decision *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) — a case that NorthBay advances — confirms this point.[71] Like this case, *West Penn* involved a hospital-system plaintiff (West Penn) that brought an antitrust claim against a health insurer (Highmark) and a rival hospital system (UPMC). *Id.* at 91–92. Among other things, West Penn alleged that the defendants had conspired to take another health-insurance plan called

---

[67] Nor can NorthBay plead an antitrust injury based on its 50% ownership of WHA, as shareholders of companies do not have standing to sue for antitrust injuries to the companies. *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1375 (9th Cir. 1996).

[68] FAC – ECF No. 62 at 27 (¶ 66), 37 (¶¶ 98–100).

[69] If Kaiser Health Plan refuses to pay, NorthBay might have a claim for that unpaid amount — but that does not give rise to an *antitrust* claim against Kaiser Health Plan.

[70] Kaiser Health Plan and Kaiser Hospitals dispute NorthBay's allegation that insurance companies are required to pay a hospital's full rates and instead argue that they need to pay only the reasonable quantum-meruit value of the hospital's services. Kaiser Defs. Mot. – ECF No. 67 at 11 (citing *Children Hosp. Cent. Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1266–67 (2014)). Whether NorthBay or the Kaiser defendants are correct on this point is immaterial; in either event, NorthBay's payments would be set by an external metric (its own billing rates or a quantum-meruit rate) and not by Kaiser Health Plan's supposed monopoly power.

[71] *See* Pls.' Opp'n to Kaiser Defs. Mot. – ECF No. 73 at 21; Pls.' Opp'n to Permanente Mot. – ECF No. 75 at 26, 27.

Community Blue off the market. But the Third Circuit held that the elimination of this health-insurance plan did not plead an antitrust injury to West Penn:

> West Penn says it was injured as a result of Highmark's decision to take Community Blue off the market. It explains that Community Blue subscribers often received treatment at West Penn hospitals and that it lost business when Community Blue was eliminated. West Penn's injury in this regard, however, is not *antitrust* injury.

*Id.* at 102 (emphasis in original). The Third Circuit noted that the defendants' elimination of a health-insurance plan might reduce competition for health insurance and therefore might cause an increase in the health-insurance premiums that patients had to pay. *Id.* But as the court noted, West Penn was not a patient, and hence this was not an antitrust injury to West Penn. *Id.* Nor was West Penn a competitor health insurer. *Id.* Instead, as the Third Circuit explained, West Penn, as an operator of hospitals, was a *supplier* in the health-insurance market, i.e., it sold hospital services to insurers. The Third Circuit held that "[a] supplier does not suffer an antitrust injury when competition is reduced in the downstream market in which it sells goods or services," and hence West Penn suffered no antitrust injury from the elimination of a health-insurance plan. *Id.* Applying the holding of *West Penn* here leads to the conclusion that even if Kaiser Health Plan were attempting to monopolize the health-insurance market, the hospital operator NorthBay suffers no antitrust injury from Kaiser Health Plan's alleged attempts to eliminate rival health-insurance plans.[72]

NorthBay is not WHA. NorthBay cannot appropriate alleged antitrust injury to WHA as its own. And NorthBay does not plead antitrust injury to itself. Its antitrust claims therefore necessarily fail.[73]

---

[72] The Third Circuit held that West Penn could plead an antitrust injury by alleging that Highmark conspired with UPMC to artificially depress the rates at which Highmark paid West Penn to below what West Penn would have received in a competitive market. *Id.* at 103. But NorthBay does not make similar allegations here. To the contrary, NorthBay alleges that it can set its billing rates at whatever level it wants and that health insurers are obligated to pay it at those rates. FAC – ECF No. 62 at 27 (¶ 66), 37–38 (¶¶ 98–100).

[73] In light of NorthBay's failure to plead causal antitrust injury, the court need not address whether NorthBay pleaded the other elements of its antitrust claims. The court refers the parties to its original dismissal order, which addressed other antitrust-claim elements, *NorthBay I*, 2017 WL 6059299, at

*(cont'd)*

ORDER – No. 17-cv-05005-LB 16

### 3. The Court Declines to Exercise Supplemental Jurisdiction Over NorthBay's Remaining Claims

If a court dismisses all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367(c). "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The remainder of NorthBay's claims arise under state law. There is no diversity of citizenship,[74] and hence the court does not have original jurisdiction over these claims. In light of these facts, and given that the litigation is at its earliest stages, the court declines to exercise supplemental jurisdiction over the remainder of NorthBay's claims.

## CONCLUSION

For the foregoing reasons, the court (1) dismisses NorthBay's claims under Section 2 of the Sherman Antitrust Act for failure to state a claim, and (2) declines to exercise supplemental jurisdiction over the remainder of NorthBay's claims and dismisses them for lack of jurisdiction.

The court grants NorthBay one final chance to amend its complaint and plead a cognizable claim over which the court has original jurisdiction. NorthBay may do so within three weeks of the date of this order. (If NorthBay files a second amended complaint, it must also file a blackline of its second amended complaint against its first amended complaint as an attachment.) If it does

---

\*4–10, and reiterates its holdings there about sufficiency and insufficiency with respect to pleading an antitrust claim.

[74] All parties are citizens of California. FAC – ECF No. 62 at 9–10 (¶¶ 11–12, 15–17).

not do so, the court will enter judgment in favor of the defendants and will direct the clerk of court to close this case.

**IT IS SO ORDERED.**

Dated: March 30, 2018

_____
LAUREL BEELER
United States Magistrate Judge