United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| NORTHBAY HEALTHCARE GROUP, et al., | Case No. 17-cv-05005-LB |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS** |
| KAISER FOUNDATION HEALTH PLAN, INC., et al., | Re: ECF No. 92, 93 |
| Defendants. | |

**INTRODUCTION**

Plaintiffs NorthBay Healthcare Group and NorthBay Healthcare Corporation (collectively, "NorthBay") operate two hospitals in Solano County, California. NorthBay brings this action against (1) Kaiser Foundation Health Plan, Inc. ("Kaiser Health Plan"), a health insurer; (2) Kaiser Foundation Hospitals, Inc. ("Kaiser Hospitals"), the operator of two other hospitals in Solano County; and (3) The Permanente Medical Group, Inc. ("Permanente"), which manages doctors that work at Kaiser Hospitals' hospitals. NorthBay alleges violations of the Sherman Antitrust Act and various California state-law claims.

The court previously dismissed NorthBay's original complaint and its First Amended Complaint ("FAC"). *NorthBay Healthcare Grp. v. Kaiser Found. Health Plan, Inc.*, No. 17-cv-

5005-LB, 2017 WL 6059299 (N.D. Cal. Dec. 7, 2017) (*NorthBay I*); *NorthBay Healthcare Grp. v. Kaiser Found. Health Plan, Inc.*, 305 F. Supp. 3d 1065 (N.D. Cal. 2018) (*NorthBay II*).[1] NorthBay has now filed a Second Amended Complaint ("SAC").[2] The SAC fails to address the deficiencies that the court identified in its earlier orders and does not plead a cognizable antitrust claim. Among its other deficiencies, the SAC — like the original complaint and FAC before it — fails to plead that NorthBay suffered antitrust injury, an essential element of its antitrust claims. The court dismisses NorthBay's antitrust claims for failure to state a claim and declines to exercise supplemental jurisdiction over NorthBay's state-law claims. Given that NorthBay has had three chances to plead an antitrust claim and has three times failed to do so, the court holds that further amendment would be futile. Dismissal is therefore with prejudice.

## STATEMENT[3]

### 1. The Players

#### 1.1 The Plaintiff

Plaintiff NorthBay operates two hospitals in Solano County that provide general hospital and emergency services: NorthBay Medical Center in Fairfield and NorthBay VacaValley in Vacaville.[4] NorthBay's Fairfield Medical Center is a Level III Trauma Center.[5]

In 2012, NorthBay embarked on the largest investment campaign in its history through a credit-financed series of projects.[6] To fund these projects, NorthBay took out $392 million in

---

[1] Orders – ECF Nos. 60, 83. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] The court finds this matter suitable for determination without oral argument. *See* N.D. Cal. Civ. L.R. 7-1(b).

[3] Unless otherwise noted, the facts recited in the Statement are allegations from the SAC.

[4] SAC – ECF No. 86 at 9 (¶ 14), 15 (¶ 33).

[5] *Id.* at 15 (¶ 33). As described further below, California regulations classify medical trauma centers into four levels, from Level I, which has the highest requirements for medical staff, equipment, and resources, to Level IV.

[6] *Id.* at 33 (¶ 89).

debt.[7] NorthBay self-describes this plan as one of "unprecedented magnitude" that left it "vulnerable to a sudden change in fortune."[8] NorthBay based its plan on expected future income and acknowledges that its investments were heavily contingent on financial stability and, in particular, steady revenues.[9]

### 1.2 The Defendants

Defendant Kaiser Health Plan is the largest health-care-service plan in the United States.[10] Over 11.8 million people in eight states and the District of Columbia are enrolled in health insurance from Kaiser Health Plan.[11] In Northern California, over 4.1 million people are enrolled in Kaiser Health Plan.[12] Kaiser Health Plan has a market share of over 88% of the commercial insureds in Solano County.[13]

Defendant Kaiser Hospitals operates hospitals throughout the United States, including two hospitals with emergency departments in Solano County: Kaiser Permanente Vallejo Medical Center in Vallejo and Kaiser Permanente Vacaville Medical Center in Vacaville.[14] Kaiser Hospitals' Vacaville hospital is the county-designated Level II Trauma Center for Solano County.[15]

Defendant Permanente is a medical group comprised of physician-owned, for-profit partnerships and professional corporations.[16] Permanente provides and manages the physicians

---

[7] *Id.* at 41 (¶ 115).

[8] *Id.* at 2 (¶ 2), 34 (¶ 89).

[9] *Id.* at 2–3 (¶ 3).

[10] *Id.* at 10 (¶ 18).

[11] *Id.*

[12] *Id.*

[13] *Id.* at 2 (¶ 1), 6–7 (¶ 8), 16 (¶ 38).

[14] *Id.* at 10–11 (¶ 19).

[15] *Id.* at 15 (¶ 33), 20 (¶ 47).

[16] *Id.* at 11 (¶ 20).

who service Kaiser Health Plan enrollees at Kaiser Hospitals' hospitals, including Kaiser Hospitals' Vallejo and Vacaville hospitals.[17]

Kaiser Health Plan, Kaiser Hospitals, and Permanente are "separate legal entities" with "separate corporate consciousnesses."[18] They are parties to legal agreements with one another, whereby Permanente doctors service Kaiser Health Plan enrollees at Kaiser Hospitals.[19] The three defendants collectively use the registered trademark or trade name "Kaiser Permanente."[20] Kaiser Hospitals has noted that "separate legal entities are responsible for managing the integrated health care system in California: [Kaiser Health Plan]; [Kaiser Hospitals]; and [Permanente], which contracts with [Kaiser Health Plan] in Northern California."[21]

### 1.3    The Non-Party

Non-party Western Health Advantage ("WHA") is a non-profit health plan that serves employers and families in various California counties.[22] NorthBay is a founding sponsor and 50% owner of WHA and sits on WHA's board of directors.[23] WHA's provider network includes nearly 700 primary-care physicians.[24] WHA also has an Advantage Referral program that allows for its members to be referred to WHA's 2,000 specialists or in-network hospitals, like NorthBay Medical Center and NorthBay VacaValley.[25] WHA had more than 8,500 members in Solano County in 2017, which amounts to a 5% market share in the county.[26]

---

[17] *Id.*

[18] *Id.* at 8 (¶ 11), 11 (¶ 21), 12 (¶ 28), 36 (¶ 97).

[19] *Id.* at 30 (¶ 75).

[20] *Id.* at 3 (¶ 3), 8–9 (¶¶ 11–12), 11 (¶ 21), 28 (¶¶ 70–71), 39 (¶ 105).

[21] *Id.* at 11 (¶ 21) (internal brackets omitted)

[22] *Id.* at 10 (¶ 17).

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.* at 10 (¶ 17), 31 (¶ 79).

NorthBay alleges that WHA is Kaiser Health Plan's only significant remaining competitor in Solano County.[27] WHA competes with Kaiser Health Plan by providing a competing non-Kaiser health-insurance option, thereby limiting demand for Kaiser Health Plan's insurance products.[28] WHA thus poses a competitive constraint on Kaiser Health Plan's power in setting the price and terms of its insurance plans for Solano County consumers.[29] WHA's prices historically have been lower than, or within 2% of, what Kaiser Health Plan charges for commercial health insurance, and WHA grants its enrollees in-network access to NorthBay Medical Center, NorthBay VacaValley, and a network of established Solano County healthcare providers.[30]

NorthBay is WHA's only in-network hospital system in Solano County.[31] NorthBay alleges that weakening NorthBay necessarily weakens WHA by making it a less attractive health-insurance option in consumers' eyes.[32] NorthBay alleges that "WHA depends on NorthBay to the point that, without NorthBay, WHA would have to exit the market for commercial health insurance in Solano County as WHA could not then meet access requirements imposed by the [Department of Managed Health Care] on all insurers."[33]

## 2. Allegations Regarding "Steering" Patients

### 2.1 "Steering" Level II Trauma Patients Away From NorthBay

California regulations classify medical trauma centers into four levels, ranging from Level I, which has the highest requirements for medical staff, equipment, and resources, to Level IV, which has lower requirements. Cal. Code Regs. tit. 22, §§ 100259–64. Solano County designates

---

[27] *Id.* at 33 (¶ 88).

[28] *Id.* at 18 (¶ 43).

[29] *Id.* at 31 (¶ 80).

[30] *Id.* at 18 (¶ 43).

[31] *Id.* at 14 (¶ 30).

[32] *Id.*

[33] *Id.*

Level II and Level III trauma facilities to provide certain levels of services.[34] For example, Level II facilities must have specialty surgeons available 24/7 on a minute's notice.[35] Accordingly, if a trauma patient has Level II injuries (like a gunshot wound to the head or severe blunt head trauma), the trauma base station generally must route the patient to the county's Level II designated trauma center, unless the patient begins to deteriorate rapidly.[36] Solano County's designated Level II trauma center is Kaiser Hospitals' Vacaville hospital.[37]

NorthBay asserts that the defendants have "steered" Level II trauma patients away from NorthBay.[38] But this is a conclusion. The SAC does not allege any examples of a Level II trauma patient ultimately being "steered" away from a NorthBay hospital. The lone allegation that NorthBay makes about any Level II trauma patient involves an incident where a patient was taken to (not away from) a NorthBay hospital. On September 25, 2017, an ambulance paramedic responded to a woman with Level II trauma status because she had an open head laceration and was asking repetitive questions.[39] The paramedic called Kaiser Hospitals' Vacaville hospital for permission to take her to NorthBay Medical Center.[40] The call center transferred the paramedic to a Permanente doctor, who told the paramedic to route the patient to Kaiser Vacaville because NorthBay did not have a neurosurgeon and because the patient needed a facility with Level II capabilities.[41] The paramedic reiterated that NorthBay had Level II capabilities and that he was closer to John Muir Walnut Creek, an out-of-county[42] designated Level II facility with the same

---

[34] *Id.* at 20 (¶ 47).

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *See id.* at 21 (¶ 48).

[39] *Id.* at 21 (¶ 49).

[40] *Id.*

[41] *Id.* at 21–22 (¶ 49). NorthBay alleges that the statement that NorthBay Medical Center did not have a neurosurgeon is false: in fact, it has five neurosurgeons on staff. *Id.* at 22 (¶ 49). It does not allege that the Permanente doctor knew this or was lying to the paramedic about NorthBay not having a neurosurgeon, as opposed to, e.g., being mistaken in good faith. *See id.*

capabilities as Kaiser Vacaville.[43] The Permanente doctor asked, "Is [the patient] a Kaiser

member?"[44] The paramedic asked the patient and responded that she was a Kaiser enrollee.[45] The

Permanente doctor then routed the patient to Kaiser Vacaville, stating that if she were stable, the

paramedic "might as well come [to Kaiser Vacaville]. Because she's going to end up there

anyway" and "It's a difference of, what, 15 minutes?"[46]

Less than five minutes later, the paramedic called the Permanente doctor again to report that

the patient was decompensating and that the paramedics needed to go to the closest trauma

center.[47] The Permanente doctor told the paramedic to turn around and take her to John Muir.[48]

Ultimately, the paramedic took her to NorthBay, where she was treated and released.[49]

## 2.2 "Steering" Level III Trauma Patients Away From NorthBay

NorthBay asserts as a conclusion that the defendants have "steered" Level III trauma patients

away from NorthBay.[50] NorthBay does not support this conclusion with factual allegations: the

---

[42] *See id.* at 15 (¶¶ 33–34) (alleging that Kaiser Vacaville is the only designated Level II trauma facility in Solano County and not including John Muir in a list of hospitals in the county); *see also* Solano Cty. Health & Soc. Servs. Dep't, Policy Memorandum 5900 – Solano County Trauma System at 2 (May 1, 2017), *available at* https://www.solanocounty.com/civicax/filebank/blobdload.aspx?BlobID=26353 (last visited Aug. 28, 2018) (designating John Muir as an out-of-county Level II trauma center). The court may take judicial notice of information on government websites that is not reasonably subject to dispute, as a matter of public record. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

[43] SAC – ECF No. 86 at 22 (¶ 50).

[44] *Id.*

[45] *Id.*

[46] *Id.* The Kaiser defendants attached an audio recording and accompanying transcript of the exchanges between the paramedic and the Permanente doctor as exhibits to their motion to dismiss NorthBay's FAC. Dodson Decl. Ex. A (recording) – ECF No. 66–3 (under seal); Dodson Decl. Ex. B (transcript) – ECF Nos. 66–4 (redacted version), 66–5 (under seal). They did not attach it as an exhibit to their current motion to dismiss. As it does not bear on the court's ultimate decision, the court does not address here whether to take judicial notice of exhibits that were attached only to a prior motion to dismiss, or whether those exhibits indicate that the Permanente doctor told the paramedic, "if you think she's unstable, then go straight to the nearest trauma center. By all means, that's fine. If you think she's totally stable and you can get here, then I think you should come here," right before saying, "It's a difference of, what, 15 minutes?"

[47] SAC – ECF No. 86 at 22 (¶ 51).

[48] *Id.*

[49] *Id.*

[50] *See id.* at 21 (¶ 48).

SAC does not allege any examples of a Level III trauma patient being "steered" away from a NorthBay hospital.

### 2.3 "Steering" Uninsured Patients to NorthBay

NorthBay asserts as a conclusion that the defendants have "steered" uninsured patients to NorthBay.[51] NorthBay does not support this conclusion with factual allegations: the SAC does not allege any examples of an uninsured patient being "steered" to a NorthBay hospital.

NorthBay's lone allegation is that, one time, Kaiser Hospitals' Vacaville hospital called NorthBay about transferring a homeless patient from Kaiser Vacaville to NorthBay.[52] On November 19, 2017, Kaiser Vacaville called NorthBay about this patient and said that the patient had received cancer treatment with NorthBay, that the patient had Partnership HealthPlan, and that the patient was "assigned" to NorthBay.[53] NorthBay reviewed the patient's information and determined that it treated the patient once in September 2017 during a brief emergency-department visit while the patient was incarcerated.[54] There was no evidence that NorthBay ever treated the patient for cancer.[55] Notably, NorthBay does not allege that the patient actually was transferred to NorthBay.[56]

NorthBay also alleges generally that the "Defendants" instructed the Vacaville Fire Department (which provides emergency medical care and transportation to emergency rooms for crisis and trauma patients) and other Vacaville paramedics that any patient who does not have

---

[51] *See id.* at 23 (¶ 54).

[52] *Id.* (¶ 55).

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] The court flagged this deficiency in its prior order dismissing NorthBay's FAC. *NorthBay II*, 305 F. Supp. 3d at 1071 ("NorthBay does not allege what happened with this patient or whether he actually was transferred or not."); *id.* at 1075 ("NorthBay's allegations that Kaiser Hospitals steers uninsured or underinsured patients away from itself and onto NorthBay are similarly conclusory. NorthBay cites two examples where Kaiser Hospitals allegedly 'insisted' on transferring patient[s] to NorthBay. But NorthBay notably does not allege that either patient actually *was* transferred to NorthBay.") (emphasis in original). The court thus presumes that NorthBay's failure to allege facts in its SAC about whether this patient was transferred to NorthBay is not an oversight.

Kaiser insurance should not be taken to a Kaiser facility.[57] The SAC does not specify which defendants or allege any specific facts regarding the defendants' supposed interactions with the Vacaville Fire Department or paramedics.[58]

### 2.4 Transferring Patients Between Kaiser Hospitals' Hospitals

NorthBay alleges facts about one patient who was admitted to a Kaiser Hospitals hospital and then was transferred to another Kaiser Hospitals hospital. In 2016, a Kaiser Health Plan enrollee underwent treatment at Kaiser Hospitals' Vacaville hospital to attempt to remove a blockage in his heart.[59] The procedure failed and required the patient to undergo cardiovascular surgery as soon as possible to surgically address the blockage.[60] Rather than transport the patient to NorthBay Medical Center, which was 13 miles away, Kaiser Hospitals transferred the patient to its Vallejo hospital, more than 30 miles away, where the patient had to wait nine days before he received treatment.[61] By then, the damage to his heart was done, and he was permanently disabled.[62]

### 3. Allegations Regarding Reimbursement Payments to NorthBay

In 2010, NorthBay and Kaiser Hospitals entered into an Agreement for Non-Referral Hospital Services for Kaiser Permanente Members ("Agreement").[63] Under the Agreement, Kaiser Health

---

[57] SAC – ECF No. 86 at 25 (¶ 60).

[58] The court flagged this deficiency in its prior order dismissing NorthBay's original complaint. *NorthBay I*, 2017 WL 6059299, at *8 ("NorthBay alleges 'upon information and belief' that the 'Defendants' have told the Vacaville Fire Department and paramedics to transfer patients who lack Kaiser Health Plan insurance to a non-Kaiser-Hospitals hospital. This allegation is wholly conclusory, and NorthBay pleads no facts regarding the defendants' supposed interactions with the Vacaville Fire Department or paramedics at all."). The court thus presumes that NorthBay's failure to allege any additional facts in its SAC about the defendants' supposed interactions with the Vacaville Fire Department or paramedics is not an oversight.

[59] SAC – ECF No. 86 at 22 (¶ 52).

[60] *Id.*

[61] *Id.* at 22–23 (¶ 52).

[62] *Id.* at 23 (¶ 52).

[63] *Id.* at 26 (¶ 64).

Plan paid NorthBay a guaranteed payment rate for NorthBay's provision of acute-care services to Kaiser Health Plan enrollees.[64]

On May 20, 2016, NorthBay received a letter on "Kaiser Permanente" letterhead announcing the termination of the Agreement effective September 18, 2016.[65] The letter referred to Kaiser Hospitals' and "Kaiser Permanente's" expectation that NorthBay would not seek reimbursement from any "member" of Kaiser Health Plan.[66] The letter did not provide an explanation on behalf of Kaiser Hospitals (or any other person or entity) for the termination.[67] Following the September 18, 2016 termination date, Kaiser Health Plan began reimbursing NorthBay at less than half the previously reimbursed rate.[68]

## STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to

---

[64] *Id.* In its original complaint, NorthBay alleged that this Agreement was between itself and Kaiser Health Plan. Compl. – ECF No. 1 at 15 (¶ 48) ("In 2010, NorthBay and Kaiser Health Plan entered into an Agreement for Non–Referral Hospital Services for Kaiser Permanente Members."). In the FAC and SAC, this has been changed to Kaiser Hospitals. FAC – ECF No. 62 at 5–6 (¶ 5.e); SAC – ECF No. 26 (¶ 64). It is unclear how an agreement between NorthBay and Kaiser *Hospitals* could bind Kaiser *Health Plan* with respect to paying NorthBay. *NorthBay II*, 305 F. Supp. 3d at 1068–69 & n.20. The Kaiser defendants attached the Agreement as an exhibit to their motion to dismiss NorthBay's original complaint. ECF No. 31-2 at 4–16 (redacted version); ECF No. 31-4 at 4–16 (under seal). They did not attach it as an exhibit to their current motion to dismiss. As it does not bear on the court's ultimate decision, the court does not address here whether to take judicial notice of exhibits that were attached only to a prior motion to dismiss, or whether paragraph 3 of those exhibits (the Agreement) actually binds Kaiser Health Plan with respect to paying NorthBay, as opposed to Kaiser Hospitals.

[65] SAC – ECF No. 86 at 27 (¶ 65).

[66] *Id.*

[67] *Id.*

[68] *Id.* (¶ 67).

raise a claim for relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations that, when accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (some internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

If a court dismisses a complaint, it ordinarily will grant leave to amend, but "[i]t is not an abuse of discretion to deny leave to amend when any proposed amendment would be futile." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990) (citing *Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1292–93 (9th Cir. 1983)).

## ANALYSIS

### 1. Governing Law

Causal antitrust injury is an essential element of a monopolization claim and a conspiracy-to-monopolize claim under Section 2 of the Sherman Antitrust Act. *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010); *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).[69] Because "causal antitrust injury is a

---

[69] The elements of a Section 2 monopolization claim are: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal 'antitrust' injury." *Allied Orthopedic*, 592 F.3d at 998 (quoting *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 735 (9th Cir. 1979)). The elements of a Section 2 conspiracy-to-monopolize claim are "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs.*, 328 F.3d at 1158 (citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 224–25 (1947)).

substantive element of an antitrust claim, . . . the fact of injury or damage must be alleged at the pleading stage." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).

"'Antitrust injury' means 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Antitrust injury has four essential elements — "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, . . . and (4) that is of the type the antitrust laws were intended to prevent" — as well as a fifth element that "the injured party be a participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Id.* (citations and internal quotation marks omitted).

## 2. Application

### 2.1 NorthBay Fails to Plead Unlawful Conduct

"Plaintiffs sometimes forget that the antitrust injury analysis must begin with the identification of the defendant's specific unlawful conduct." *Am. Ad Mgmt. v. Gen. Tel Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999). NorthBay fails to plead specific unlawful conduct by any of the defendants. It therefore does not plausibly allege the first element of antitrust injury.

#### 2.1.1 NorthBay does not plausibly allege unlawful "steering"

As the court has said twice before, "[n]aked assertions devoid of further factual enhancement are insufficient to state a claim." *NorthBay II*, 305 F. Supp. 3d at 1074 (internal brackets, internal quotation marks, and ellipsis omitted) (quoting *Oliver v. SD-3C LLC*, No. 11-cv-01260-JSW, 2016 WL 5950345, at *11 (N.D. Cal. Sept. 30, 2016) (quoting *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 926–27 (9th Cir. 2013))); *NorthBay I*, 2017 WL 6059299, at *7 (same); *accord Somers*, 729 F.3d at 966 ("[T]he possibility that [plaintiff] 'might later establish some set of undisclosed facts' supporting antitrust injury, . . . is not enough to permit the SAC to survive a Rule 12(b)(6) motion to dismiss.") (quoting *Twombly*, 550 U.S. at 561). The court warned NorthBay that its steering allegations in its original complaint and FAC lacked factual

enhancement and were conclusory. Despite this, NorthBay adds no new factual allegations in its SAC to support its conclusions about steering. Its claim therefore fails.

First, NorthBay claims that the defendants steer Level II and Level III trauma patients away from to NorthBay. But NorthBay pleads no facts to support that conclusion: it does not cite any examples of Level II or III patients who were steered away from NorthBay. The only example of a Level II trauma patient is a patient who ended up at NorthBay; that does not plausibly plead that patients are improperly being steered away from NorthBay.[70] And NorthBay's SAC includes no mention of any Level III patients at all. In sum, there are no fact allegations in the SAC that support NorthBay's conclusions. *Cf. NorthBay II*, 305 F. Supp. 3d at 1074–75; *NorthBay I*, 2017 WL 6059299, at *7.

Second, NorthBay claims that the defendants steer uninsured patients to NorthBay. Again, NorthBay pleads no facts to support that conclusion: it does not cite any examples of uninsured patients who were steered to NorthBay. NorthBay claims that it needs discovery to support its claims. But from its own records, it ought to be able to tell whether the defendants steered uninsured patients to it, whether it accepted any, and whether it incurred costs in treating them. NorthBay did not find identify or allege any uninsured patients who were actually steered to it to allege in its SAC. Its conclusory assertions of steering uninsured patients do not plausibly plead a claim. *Cf. NorthBay II*, 305 F. Supp. 3d at 1075.

Third, NorthBay claims that the defendants instructed the Vacaville Fire Department and other Vacaville paramedics that they should not take patients who do not have Kaiser Health Plan insurance to a Kaiser Hospitals facility. But NorthBay pleads no facts regarding the defendants' supposed interactions with the Vacaville Fire Department or paramedics that support its assertion.

---

[70] NorthBay alleges that the treating paramedic and a Permanente doctor discussed taking the patient to Kaiser Hospitals' Vacaville hospital or to John Muir Walnut Creek before the paramedic took her to NorthBay. But as NorthBay itself acknowledges, Solano County regulations require Level II trauma patients to be transported to a Level II trauma center unless the patient begins to rapidly deteriorate. Kaiser Vacaville and John Muir are county-designated Level II trauma centers. NorthBay's hospitals are not.

As the court has held previously, this naked assertion is too conclusory to plead a claim. *Cf. NorthBay I*, 2017 WL 6059299, at *8.

### 2.1.2    NorthBay does not plausibly allege unlawful reimbursement practices

In addition to its steering claims, NorthBay reiterates its earlier argument about the termination of the 2010 Agreement and its reimbursement rate. The court has twice rejected this argument and is not persuaded by it now. *NorthBay II*, 305 F. Supp. 3d at 1073–74; *NorthBay I*, 2017 WL 6059299, at *6, *8–10.

First, NorthBay does not plead that the termination of the 2010 Agreement was unlawful. NorthBay does not plead that Kaiser Health Plan's or Kaiser Hospitals' termination of the Agreement in 2016 breached any term of the Agreement — and if the Agreement were terminable at will, the mere fact that it was terminated does not plead an antitrust violation. *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76–77 (2d Cir. 2013) ("Because [plaintiff]'s dealership agreement was terminable without cause, [plaintiff] cannot assert that the mere termination of its dealership, without more, constitutes an antitrust violation.").[71] Moreover, NorthBay does not plead that the termination of the Agreement violated any law. To the contrary, as NorthBay itself alleges, private insurers may selectively contract with hospitals that offer the lowest rates as they see fit.[72]

Second, NorthBay does not plead that Kaiser Health Plan's reimbursement payments to NorthBay were unlawful. NorthBay asserts that Kaiser Health Plan is responsible — and required under California Health and Safety Code § 1317.2a(d) — to reimburse it for the "reasonable charges" it incurs in providing acute-care services to Kaiser Health Plan enrollees.[73] A close reading of the SAC reveals that NorthBay does not plead that Kaiser Health Plan is not

---

[71] NorthBay appears to acknowledge that the termination of the Agreement alone does not plead antitrust injury and therefore argues that the court should focus on "the contractual termination *and* subsequent failure to reimburse[.]" NorthBay Opp'n to Kaiser Defs. Mot. – ECF No. 98 at 27 (emphasis in original).

[72] SAC – ECF No. 86 at 42 (¶ 119).

[73] *Id.* at 26 (¶ 63), 27 (¶ 67).

reimbursing NorthBay for the reasonable charges it incurs. Instead, what NorthBay alleges is that Kaiser Health Plan is reimbursing NorthBay at less than half the rate that it used to pay NorthBay under the Agreement.[74] But pleading that Kaiser Health Plan is paying NorthBay less than what it used to pay NorthBay, or less than NorthBay might otherwise like to charge, does not plead that Kaiser Health Plan is not paying NorthBay for its reasonable charges or that any of the defendants are engaging in unlawful conduct. *See Children's Hosp. Cent. Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1275 (2014) ("'A medical care provider's billed price for particular services is not necessarily representative of either the cost of providing those services or their market value.' Rather, the full billed charges reflect what the provider unilaterally says its services are worth.") (internal brackets omitted) (quoting *Howell v. Hamilton Meat & Provisions, Inc.*, 52 Cal. 4th 541, 564 (2011)).[75]

### 2.2    NorthBay Fails to Plead Causal Injury That Flows From Unlawful Conduct

In addition to unlawful conduct, "[a] plaintiff must also allege some credible injury caused by the unlawful conduct." *Am. Ad Mgmt.*, 190 F.3d at 1056. Additionally, even if the plaintiff can show injury, "[i]t is not enough to show that one's injury was caused by illegal behavior." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2011) (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109 (1986); *Brunswick*, 429 U.S. at 485–86). "'To show antitrust injury, a plaintiff must prove that his loss flows from an *anticompetitive* aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition.'" *Id.* (emphasis in original) (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995)). "'If the injury flows from aspects of

---

[74] *Id.* at 27 (¶ 67) (alleging that "Kaiser Foundation Health Plan has been responsible for the 'reasonable charges' incurred by NorthBay in treating its insureds. But, from one day to the next, Kaiser Foundation Health Plan began reimbursing NorthBay at less than half the rate it had previously paid NorthBay," but not alleging that Kaiser Health Plan has not been reimbursing NorthBay for its reasonable charges), 38 (¶ 104) (same).

[75] NorthBay's quasi-rhetorical question — "Following the September 18, 2016 termination date, . . . Kaiser Foundation Health Plan began reimbursing NorthBay at less than half the rate it had previously paid NorthBay — even for the exact same services. The reasonable value of the services provided by NorthBay was not reduced by over 50% from one day to the next," *id.* at 27 (¶ 67) — is not actually an allegation that Kaiser Health Plan was paying NorthBay less than the reasonable charges it incurred.

the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se.'" *Id.* (citing *Rebel Oil*, 51 F.3d at 1433). Among other things, "[a] decrease in one competitor's market share . . . affects competitors, not competition. . . . Increased concentration may make anticompetitive action more likely, but in and of itself it does not amount to antitrust injury." *Id.* at 1036 (citing *Cargill*, 479 U.S. at 116; *Brunswick*, 429 U.S. at 486–87); *accord Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989) ("[R]emoval of one or a few competitors need not equate with injury to competition. . . . [C]laimants must plead and prove a reduction of competition in the market in general and not mere injury to their own positions as competitors in the market.") (citing cases).

NorthBay fails to plead that it suffered any injury, and further fails to plead that any injury it suffered flowed from an anticompetitive aspect or effect of any defendant's behavior. It therefore does not plausibly allege the second and third elements of antitrust injury.

### 2.2.1 NorthBay does not plausibly allege that it suffered any "steering" injury or that any such injury flowed from an anticompetitive aspect or effect of the defendants' behavior

NorthBay does not plausibly plead any injury that was caused by any alleged "steering" of uninsured patients to its hospitals. It does not allege any uninsured patients that it accepted from the defendants or any money that it spent on such patients' care. NorthBay claims generally that it spent more on charity care in 2017 than it did in 2016,[76] but it does not allege any facts that plead that this increase was due to any steering of uninsured patients, much less that this was caused by the defendants.

NorthBay also does not plausibly plead injury from any alleged "steering" of Kaiser Health Plan enrollees to Kaiser Hospitals' hospitals instead of to NorthBay's hospitals. NorthBay does not establish that it has a right to claim those patients for itself, and therefore it does not allege an injury from those patients' not being taken to NorthBay. NorthBay cites an example of a Kaiser Health Plan enrollee who was being treated at one of Kaiser Hospitals' hospitals and then was

---

[76] *Id.* at 3 (¶ 4.a), 24 (¶¶ 57–58).

transferred to another of Kaiser Hospitals' hospitals. NorthBay intimates that the patient should have been transferred to NorthBay instead and that, because the patient was transferred instead to another Kaiser Hospitals hospital and had to wait for treatment, he suffered heart damage. Perhaps the patient might have a claim for any injury he suffered to his heart. But the patient is not the plaintiff here, and NorthBay cannot base its antitrust claim on the patient's injuries. *Cf. Novation Ventures, LLC v. J.G. Wentworth Co., LLC*, 711 F. App'x 402, 404 (9th Cir. 2017) ("[Plaintiff] could not merely rely upon harm to consumers, if any there was, to establish its own standing to sustain an antitrust claim.") (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999); *Am. Ad Mgmt.*, 190 F.3d at 1056). All that NorthBay claims for itself is that it did not have the opportunity to treat the patient — and bill for his treatment. NorthBay could not plausibly assert that it has a right to take and treat the patient when he was first admitted to a Kaiser Hospitals hospital. It cannot claim that the defendants caused NorthBay injury by not forcing the patient to transfer to NorthBay. NorthBay has no right to the patient while he was being transferred from one Kaiser Hospitals hospital to another (and it has no right to other Kaiser Health Plan enrollees who are being taken to Kaiser Hospitals' hospitals). *See NorthBay II*, 305 F. Supp. 3d at 1075 n.64; *accord Pacifica Kidney Ctr., Inc. v. Nat'l Med. Care, Inc.*, 995 F.2d 232, 1993 WL 190858, at *3 (9th Cir. 1993) (table) (rejecting argument that "the 'channeling' of patients [to preferred hospitals] in and of itself makes out the requisite injury to competition").[77] NorthBay's steering allegations do not plead that it suffered a cognizable injury related to steering that flowed from an anticompetitive aspect or effect of the defendants' behavior.

---

[77] NorthBay cites *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997), in support of its steering theories. To the extent that this case addresses steering at all, it addresses only a scenario of a hospital steering indigent patients to its competitors, which raised its competitors' costs, which in turn allowed the defendant hospital to raise its prices. *Id.* at 1478. It does not address a hospital or health insurer steering its own enrollees to its own hospitals or a situation where steering might result in lower costs, not higher ones, for patients.

### 2.2.2 NorthBay does not plausibly allege that it suffered any reimbursement injury or that any such injury flowed from an anticompetitive aspect or effect of the defendants' behavior

As discussed above, NorthBay asserts that Kaiser Health Plan is responsible to reimburse it for the "reasonable charges" it incurs in providing acute-care services to Kaiser Health Plan enrollees, but it never actually pleads that Kaiser Health Plan is not doing so. NorthBay therefore does not allege any injury related to reimbursement.

Even if NorthBay had pleaded that Kaiser Health Plan were under-reimbursing it, this would not plead an antitrust injury. As another court explained in a similar case (in a decision affirmed by the Ninth Circuit), "alleged injury incurred by Kaiser Defendants' refusal to pay claims for [plaintiff hospital]'s services . . . show only potential harm to [plaintiff] alone," which does not plead an antitrust injury, as it does not plead injury to competition as a whole. *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-cv-2652-GPC-RBB, 2013 WL 3873074, at *13 (S.D. Cal. July 25, 2013) ("the alleged violation must cause injury to competition beyond the impact on the claimant") (citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988)), *aff'd*, 642 F. App'x 665 (9th Cir. 2016).

An additional problem with NorthBay's theory is that the putative injury it claims it suffered — less money from Kaiser Health Plan — would be the same regardless of whether Kaiser Health Plan were a monopoly or had a dozen competitors. An action that would have injured the plaintiff in the same way regardless of whether or not the defendant has a potential to monopolize does not give rise to an antitrust injury. *Am. Ad Mgmt.*, 190 F.3d at 1056 (citing *Brunswick*, 429 U.S. at 480).

In defense of its putative antitrust theory, NorthBay asserts that Kaiser Health Plan started paying NorthBay less than half the rate it had previously paid, and it claims that "[t]he reasonable value of the services provided by NorthBay was not reduced by over 50% from one day to the next, so the only rational explanation for Kaiser Foundation Health Plan's conduct was an effort to starve NorthBay of revenue."[78] The court is not convinced. In evaluating whether a complaint

---

[78] SAC – ECF No. 86 at 27 (¶ 67), 38 (¶ 104).

pleads antitrust injury, a court must consider whether there are other obvious alternative explanations for the alleged conduct. *See Somers*, 729 F.3d at 965 (holding that plaintiff did not plead antitrust injury where there were "other 'obvious alternative explanations'" for allegedly monopolistic pricing); *see generally Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) ("When considering plausibility, courts must also consider an 'obvious alternative explanation' for defendant's behavior.") (citing *Iqbal*, 556 U.S. at 682). An obvious alternative explanation is that Kaiser Health Plan determined that NorthBay's billing rates under the Agreement were too high, and it decided to terminate the Agreement in order to reduce what it had to pay to NorthBay and thereby reduce its own operating costs. *NorthBay I*, 2017 WL 6059299, at *6 n.54; *see Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 892 (9th Cir. 2006) ("[H]ospitals prefer high reimbursement rates and insurers prefer low reimbursement rates, as each group pursues its own economic interest."); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws.") (citing *Twombly*, 550 U.S. at 553–58 & n.5).[79] NorthBay does not plead that it suffered a cognizable injury related to reimbursements that flowed from an anticompetitive aspect or effect of the defendants' behavior as opposed to a standard business decision by a contractual counterparty.[80]

---

[79] Kaiser Health Plan or Kaiser Hospitals could have entered into the Agreement in 2010 and then rationally decided in 2016 that NorthBay was charging too much. A lot can change in six years, including the reimbursement rates, which NorthBay had the ability under the Agreement to increase over time. *See id.* at 26 (¶ 64).

[80] NorthBay asserts in passing that Kaiser Health Plan is a monopsony (as opposed to a monopoly) and used its monopsony power to unilaterally dictate reimbursement rates in Solano County. *Id.* at 4 (¶ 4.e). It does not support that conclusion with any factual allegations, however, and that conclusion is inconsistent with its later allegations that California Health and Safety Code § 1317.2a(d) — and not Kaiser Health Plan's monopsony power — dictates reimbursement rates. *See id.* at 26 (¶ 63).

### 2.3 NorthBay Fails to Plead an Injury of the Type the Antitrust Laws Were Intended to Prevent

To state an antitrust claim, "the plaintiff's injury must be 'of the type the antitrust laws were intended to prevent.'" *Am. Ad Mgmt.*, 190 F.3d at 1057. "The Supreme Court has made clear that injuries which result from *increased* competition or lower (but non-predatory) prices are not encompassed by the antitrust laws." *Id.* (emphasis in original) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337–40 (1990)). "[T]he antitrust laws are only concerned with acts that harm 'allocative efficiency *and* raise the price of goods above their competitive level or diminish their quality.'" *Pool Water*, 258 F.3d at 1034 (emphasis in original, internal brackets omitted) (quoting *Rebel Oil*, 51 F.3d at 1433).

NorthBay does not plead an injury of the type the antitrust laws were intended to prevent. It therefore does not plausibly allege the fourth element of antitrust injury.

### 2.3.1 NorthBay's alleged "steering" injuries are not of the type the antitrust laws were intended to prevent

NorthBay's steering allegations, at their core, are that when patients suffer traumatic injury, NorthBay should be able to treat the patients and bill for their treatment. NorthBay makes no "steering" allegations about patients who are able to stand on their own two feet and decide for themselves what hospital they want for their treatment.[81]

Patients (including Kaiser Health Plan enrollees) who pick a Kaiser Hospitals hospital over a NorthBay hospital do not cause an antitrust injury. *See Barry v. Blue Cross of Cal.*, 805 F.2d 866, 872 (9th Cir. 1986) ("When a consumer contracts to buy services from one health plan, the consumer will then have little or no demand for the services of a nonparticipating [hospital], especially if the consumer would have to pay more for these services. The contract does not mean that the parties have agreed to an unlawful concerted refusal to deal.").[82]

---

[81] *See* SAC – ECF No. 86 at 19–23 (¶¶ 45–53) (making steering allegations solely as to trauma patients).

[82] NorthBay complains that the defendants realize profits from the "day-to-day care of captive in-network enrollees." *Id.* at 19 (¶ 43). But it does not allege facts supporting its conclusion that Kaiser

*(cont'd)*

NorthBay's limited theory is that when patients suffer traumatic injury (and may not be able to express their choice for themselves), they should be steered to NorthBay so that NorthBay can bill for their care. NorthBay does not claim that it suffers injury from its ability to provide the patient better care at lower rates. What it complains instead is that trauma centers "are also among the most profitable medical departments in a hospital."[83] The lost opportunity for NorthBay to profit from trauma patients is not an injury of the type that the antitrust laws were intended to protect.[84]

### 2.3.2 NorthBay's alleged reimbursement injuries are not of the type the antitrust laws were intended to prevent

In 2016, Kaiser Health Plan or Kaiser Hospitals[85] terminated its Agreement with NorthBay and reduced the amount it was paying NorthBay for hospital services. This is not monopolistic behavior by Kaiser Health Plan or Kaiser Hospitals — indeed, it is the opposite. NorthBay itself alleges that:

---

Health Plan enrollees are "captive": it does not allege that any defendant has done anything to stop any patient from choosing to go to a NorthBay hospital should she choose to go there (or to stop any doctor from referring a patient to a NorthBay hospital). The fact that Kaiser Health Plan enrollees might choose not to go to NorthBay — perhaps because NorthBay is an out-of-network provider and charges higher rates — does not, without more, render the enrollees captive. *Cf. Barry*, 805 F.2d at 872 ("Under the [health-insurance] Plan, a consumer still enjoys complete freedom to seek treatment from a nonparticipating physician; moreover, a Plan physician can refer any or all of his patients to a nonparticipating physician. Ordinary competitive market forces — lower prices — have simply reduced the demand for the nonparticipating physician's services.").

[83] SAC – ECF No. 86 at 19 (¶ 44).

[84] In addition to directing that patients who suffer Level II trauma injuries should be taken to Level II trauma centers, county protocols direct ambulances to let non-critical patients choose to which hospital they want to go — and if a patient cannot communicate her choice, the ambulance should try to determine the hospital the patient would have preferred based on the patient's preexisting relationships with a hospital. Solano Cty. Health & Soc. Servs. Dep't, Policy Memorandum 6700 – Destination Protocol for Ambulances, at 3 (Apr. 24, 2017), *available at* https://www.solanocounty.com/civicax/filebank/blobdload.aspx?BlobID=26280 (last visited Aug. 28, 2018) ("Patients are entitled to choose the hospital where their care is to be given."); *id.* at 2 ("If a patient is unable to communicate a choice[,] the prehospital personnel shall use whatever other sources of information that might be available to indicate a pre-existing relationship."). (The Kaiser defendants attached this memorandum as an exhibit to a prior motion to dismiss, Allen Decl. Ex. D – ECF No. 67-7, and the court may take judicial notice of it as a matter of public record, *Daniels-Hall*, 629 F.3d at 998–99.) NorthBay does not explain how any alleged "steering" of Kaiser Health Plan enrollees to Kaiser Hospitals' hospitals is due to an anticompetitive aspect or effect of any defendant's behavior, as opposed to ambulances and paramedics following county guidelines about respecting patients' presumptive choice. *See NorthBay II*, 305 F. Supp. 3d at 1075 n.64.

[85] *See supra* note 64.

It is the public policy of the State of California to let the market control hospital rates. In 1982, the California Legislature implicitly rejected a system of regulated hospital rates by passing legislation that allowed both the Medi-Cal program (AB 799) and private insurers (AB 3480) to selectively contract with hospitals that offer the lowest rates. . . . Consistent with this market approach to hospital rates, the California Legislature relies on an active marketplace to establish and maintain reasonable rates for hospital services.[86]

Under NorthBay's own recitation of California public policy, health insurers' selectively contracting with hospitals is not monopolistic behavior that "raise[s] the price of goods above their competitive level or diminish[es] their quality." *Cf. Pool Water*, 258 F.3d at 1034. It is instead the mechanism that keeps hospital prices in *check* and prevents hospitals from raising their prices without limit.

It is NorthBay that threatens to drive up prices. NorthBay implies that once a health insurer like Kaiser Health Plan enters into an agreement with hospitals such as NorthBay's or begins paying hospitals at a certain rate, it cannot later terminate the agreement or lower that rate without running afoul of antitrust laws. The implication of this argument is that once a health insurer signs an agreement with a hospital, it is rendered captive to the hospital's pricing under the agreement, potentially indefinitely, even if the hospital is charging supra-competitive rates.[87] The cost of paying these hospital rates in turn would be passed to the health insurer's enrollees in the form of higher premiums, driving up the cost of medical care. This is not the result the antitrust laws were meant to achieve. *NorthBay II*, 305 F. Supp. 3d at 1074; *accord, e.g.*, *Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.*, No. 3:16-CV-1000, 2018 WL 2209518, at *4 (M.D. Pa. May 14, 2018) ("Plaintiffs' injury flows from their loss of a single — albeit lucrative — client. This type of injury does not amount to a decline in *competition* in the overall . . . market. If anything, . . . [defendant]'s effort to select subcontractors with the lowest prices, is exactly the type of competition that antitrust laws are meant to foster.") (emphasis in original, internal quotation marks omitted), *appeal docketed*, No. 18-2316 (3d Cir. June 15, 2018).

---

[86] SAC – ECF No. 86 at 42 (¶¶ 119–20).

[87] Supra-competitive rates may be a result of the hospital raising its rates over time or of other hospitals becoming more competitive and lowering theirs.

As with its steering allegations, NorthBay's reimbursement allegations do not relate generally to patients who can choose what hospital they want to treat them; they relate solely to patients who need acute care.[88] Absent an allegation that NorthBay's prices have been driven down to below-market or predatory levels — an allegation absent here — the lost opportunity for NorthBay to charge higher prices for acute-care patients is not an injury of the type that the antitrust laws were intended to protect.

### 2.3.3 NorthBay's debt load and financial difficulties are not injuries of the type the antitrust laws were intended to prevent

As numerous courts have observed, "some antitrust cases are intrinsically hopeless because they merely dress up in antitrust garb what is, at best, a business tort or contract violation." *Hu Honua Bioenergy, LLC v. Haw. Elec. Indus., Inc.*, No. 16-00634 JMS-KJM, 2018 WL 491780, at *12 (D. Haw. Jan. 19, 2018) (internal brackets and ellipsis omitted) (quoting *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1087 (11th Cir. 2016) (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 69 (1st Cir. 2004))). This is one of those cases.

NorthBay alluded to its reason for bringing this action in its original complaint and FAC. Its SAC makes explicit its reason — namely, its decision to take out $392 million in debt.[89] NorthBay took on this debt in order to invest heavily in medical services, infrastructure, and technologies.[90] NorthBay acknowledges that its debt load was of "unprecedented magnitude" and left it "vulnerable to a sudden change in financial fortune."[91] NorthBay admits that its financial status was heavily contingent on financial stability and, in particular, steady revenues.[92] NorthBay does not plead that it had a guarantee of steady revenues, and the antitrust laws do not provide it with one.

---

[88] *See* SAC – ECF No. 86 at 26–27 (¶¶ 62–68) (making reimbursement allegations solely relating to acute-care patients).

[89] SAC – ECF No. 86 at 37 (¶ 99); *see also id.* at 2 (¶¶ 2–3), 4–5 (¶ 4.d–f), 34 (¶¶ 89–91), 41 (¶ 115).

[90] *Id.*

[91] *Id.* at 2 (¶¶ 2–3), 34 (¶ 89).

[92] *Id.* at 2 (¶ 3).

That NorthBay might have made a bad business decision — overextending itself by taking out an unprecedented amount of debt based on revenues that might not materialize — does not mean that it suffered an antitrust injury. *See Cascade Health*, 515 F.3d at 902 ("[T]he antitrust laws' prohibitions focus on protecting the competitive process and not on the success or failure of individual competitors.") (citing cases); *accord West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 102–03 (3d Cir. 2010) (hospital that took out $125 million loan to improve and expand its medical facilities did not suffer an antitrust injury when health insurer decided not to refinance hospital's loan). Nor does it give NorthBay an enforceable right to recoup its debt from Kaiser Health Plan enrollees who suffer acute or traumatic injury by demanding that those patients be brought to NorthBay where it — NorthBay — can charge for them at its — NorthBay's — preferred billing rates.[93]

### 2.4 NorthBay's Arguments About How Its Injury Is "Inextricably Intertwined" With Supposed Injuries to WHA Do Not Save Its Complaint

NorthBay argues that the defendants inflicted injury on NorthBay in order to hinder WHA, Kaiser Health Plan's only significant competitor in Solano County.[94] NorthBay argues that its injuries are "inextricably intertwined" with the harm that the defendants are inflicting on WHA — and, by extension, on the health-insurance market — and it therefore suffered antitrust injury and can bring an antitrust claim. *Cf. Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982) (in certain situations, plaintiffs that are not participants in the same market as defendants but whose injuries are "inextricably intertwined" with the injury defendants sought to inflict market participants can assert an antitrust claim).[95] NorthBay's theory fails.

---

[93] If NorthBay's financial condition were so contingent on steady revenues from acute-care and trauma patients as its SAC implies, one wonders what NorthBay would do if health-and-safety improvements resulted in fewer people needing acute care or suffering traumatic injury.

[94] SAC – ECF No. 86 at 7 (¶ 9).

[95] Hospitals are not participants in the health-insurance market (i.e., Kaiser Health Plan's market) as either consumers or competitors. Instead, hospitals are participants in a related but separate market for the provision of medical care, selling medical-care services to both patients and health insurers. *See West Penn*, 627 F.3d at 102; *Cascade Health*, 515 F.3d at 892.

The "inextricably intertwined" doctrine is a limited exception only to the fifth element of antitrust injury — namely, that the injured party must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market. *See Am. Ad Mgmt.*, 190 F.3d at 1057 n.5 ("We recognize that the Supreme Court has carved a narrow exception to the market participant requirement for parties whose injuries are 'inextricably intertwined' with the injuries of market participants.") (citing *McCready*, 457 U.S. 465). It is not an exception to the other four elements — namely, (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, (4) that is of the type the antitrust laws were intended to prevent. *See id.* As the Ninth Circuit has explained:

> [W]e have sometimes expressed the injury requirement in terms of the harm being "inextricably intertwined" with the defendant's wrongdoing. The simple invocation of this phrase, however, will not allow a plaintiff to avoid the fundamental requirement for antitrust standing that he or she have suffered an injury of the type — almost exclusively suffered by consumers or competitors — that the antitrust laws were intended to prevent.

*Or. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 967 (9th Cir. 1999) (quoting *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926 n.8 (3d Cir. 1999)). As discussed above, NorthBay fails to plead any of the first four elements of antitrust injury, and hence its claim necessarily fails regardless of whether it might have an exception to the fifth.

Ultimately, NorthBay's invocation of the "inextricably intertwined" doctrine is a red herring. If NorthBay had otherwise plausibly alleged that the defendants conspired to engage in unlawful anticompetitive conduct against WHA to monopolize the health-insurance market, perhaps it could properly invoke the "inextricably intertwined" doctrine to explain why it could bring an antitrust violation despite not being a direct participant in that market. But that is not the SAC's only defect. The more fundamental flaw is that NorthBay does not plausibly plead that the defendants

1    engaged in unlawful anticompetitive conduct that caused injury of the type that the antitrust laws

2    were intended to protect at all.[96]

3        NorthBay claims that if it no longer existed, WHA would have to exit the health-insurance

4    market because it could no longer meet the access requirements that the California Department of

5    Managed Health Care imposes on insurers.[97] But NorthBay does not plausibly allege that the

6    defendants are driving it out of existence and thereby forcing WHA to leave the market as well.

7    NorthBay instead alleges only that the defendants are paying it less and it therefore has less money

8    to invest in its own projects, such as developing new facility campuses, improving earthquake-

9    remediation compliance, recruiting new physicians, and participating in community-based

10    programs.[98] But allegations that "the defendants should give it — NorthBay — more money so

11    that it — NorthBay — can invest more money in its — NorthBay's — chosen projects. . . do[] not

12    plead an injury to competition as a whole." *NorthBay II*, 305 F. Supp. 3d at 1074; *see also J. Allen*

13    *Ramey, M.D., Inc. v. Pac. Found. for Med. Care*, 999 F. Supp. 1355, 1364 (S.D. Cal. 1998) ("The

14    antitrust laws do not require the market to subsidize underappreciated products to ensure their

15    'competitiveness.'").

16        This case, at its core, is not complex. The defendants terminated an Agreement with NorthBay

17    and determined to reimburse NorthBay at lower reasonable-charges rates instead of higher

18    contractual rates, thereby reducing their own costs, which they are permitted to do under

19    California Health and Safety Code § 1317.2a(d). Regardless of whether NorthBay tries to frame

20

21    —————————————

22    [96] For example, NorthBay does not allege that the defendants charged predatorily low prices, *cf. Amarel v. Connell*, 102 F.3d 1494, 1508–09 (9th Cir. 1997), or organized a boycott, *cf. id.* at 1509;

23    *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 742–43 (9th Cir. 1984), or forced NorthBay to accept below-market reimbursement rates, *cf. West Penn*, 627 F.3d at 103–04, or prevented other market

24    participants (whether patients, insurance plans, or hospitals) from engaging in direct discussions with one another and entering into any agreements or arrangements they might individually wish to

25    negotiate, *cf. Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 293 & n.3 (2d Cir. 1983), or engaged in activity that had no plausible purpose and rendered it no plausible benefit other

26    than thwarting competition, *cf. Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 174 (3d Cir. 2015).

27    [97] SAC – ECF No. 86 at 14 (¶ 30).

      [98] *Id.* at 14 (¶ 30), 32 (¶ 84).

28

this as an attack on NorthBay or an attack on WHA, this is not an antitrust injury, and NorthBay's invocation of the phrase "inextricably intertwined" does not create an antitrust injury where one does not exist otherwise.

### 3. The Court Declines to Exercise Jurisdiction Over NorthBay's Remaining Claims

If a court dismisses all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367(c). "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

NorthBay's remaining claims arise under state law. There is no diversity of citizenship,[99] and hence the court does not have original jurisdiction. Given that the litigation is at its earliest stages, the court declines to exercise supplemental jurisdiction over the remainder of NorthBay's claims.

### CONCLUSION

The court grants the defendants' motions to dismiss. Given that NorthBay has had three chances and has not pleaded a cognizable antitrust claim, the court holds that further amendment would be futile and dismisses NorthBay's SAC with prejudice.

**IT IS SO ORDERED.**

Dated: August 28, 2018

_____
LAUREL BEELER
United States Magistrate Judge

---

[99] All parties are citizens of California. SAC – ECF No. 86 at 9–11 (¶¶ 14–15, 18–20).

United States District Court
Northern District of California